**IN THE COURT OF APPEALS OF THE STATE OF NEW MEXICO**

**Opinion Number: 2009-NMCA-027**

**Filing Date:  February 3, 2009**

**Docket Nos. 26,131 and 26,562 (consolidated)**

**STATE OF NEW MEXICO,**

>        **Plaintiff-Appellee,**

**v.**

**DYLAN J.**

>        **Defendant-Appellant.**

**APPEAL FROM THE DISTRICT COURT OF BERNALILLO COUNTY**
**Denise Barela Shepherd, District Judge**

Gary K. King, Attorney General
Katherine Zinn, Assistant Attorney General
Santa Fe, NM

for Appellee

Trace Rabern
Santa Fe, NM

Robert Rosenthal
New York, New York

for Appellant

**OPINION**

**SUTIN, Judge.**

**{1}**      The opinion filed in this appeal on November 21, 2008, is hereby withdrawn.  This opinion is substituted in its stead.  This opinion is being refiled in order to list New York attorney Robert Rosenthal as Defendant's counsel after this Court, based on the peculiar circumstances in this case, ruled on a second motion to add his name despite his failure to timely comply with the only controlling rule under the circumstances in this case for non-admitted counsel to appear before this Court.  *See* Rule 12-302(F)(2) NMRA.

1

**{2}** In this case, the jury convicted Defendant Dylan J. of three counts of criminal sexual penetration (CSP) in the first degree (child under thirteen), the victims of which were his two young sons. Defendant was acquitted of three counts of CSP. For the reasons discussed in this opinion, we affirm Defendant's convictions.

## BACKGROUND

**{3}** Defendant has two sons with his former wife, Anna. T.J. was born in 1999, and B.J. was born in 1997. Defendant and Anna separated in 2000, but continued to live together until late 2001 when Anna and the boys moved out of the home. For approximately one more year, Defendant would go to Anna's apartment and stay with the boys while Anna would stay overnight with Julie, a woman she was dating at the time. In December 2002, Julie moved in with Anna and the boys; the boys would visit with Defendant on Sundays and Tuesdays. B.J. began to see a therapist around the time that his parents separated.

**{4}** In May 2003, T.J., who was four years old at the time, woke up "very upset and very nervous" and had wet the bed. Anna testified that T.J. expressed great concern about B.J., who was spending the night with Defendant, and he wanted Anna to pick up B.J. right away. Anna testified that T.J. talked about someone getting "on him." Anna testified that she asked T.J. if Defendant had "gotten on him," and he said "Yes." Anna also testified that she asked T.J. if Defendant had told him not to tell Anna about the incident, and T.J. said "Yes." Anna further testified that a day later T.J. asked if Anna "was going to smash his penis," following which Anna asked T.J. if someone had smashed his penis. T.J. answered "Yes" and identified Defendant. Anna did not ask B.J. about whether he had been abused, but she and Julie decided that the boys would not be allowed to see Defendant until they could determine what had happened. Anna explained to her sons that Defendant had made "bad choices," which were defined to the boys as "when a grown[-]up touches your private parts or touches you with their private parts."

**{5}** According to Anna's testimony at trial, a few days after the nighttime incident with T.J., B.J. was riding his bicycle when he threw it down in anger and stated, "I know what you want to know and I'm not going to tell." The same day or the day after the incident with the bicycle, B.J. asked Anna to stroke his arm while she was putting him to bed, which she thought was sexually suggestive and thus refused to do. The next day Anna told B.J. that she wanted to explain to him why she did not want to rub his arm, then she reminded him about not seeing Defendant for a while because of "bad choices" Defendant may have made with T.J., and B.J. responded that Defendant had made "bad choices" with him as well. Anna testified that B.J. then told her "everything that had ever happened to him . . . about things that had been done to him and to his brother." Anna testified that these disclosures were made to her in late May 2003 and that she reported the disclosures to the New Mexico Children, Youth and Families Department.

**{6}** Anna and Julie had, for some time prior to the foregoing conversations, discussed

2

moving to Vermont, but had not secured jobs or housing for the move. However, when Anna was confronted with allegations by the boys that they had been abused, she and Julie decided to move to Vermont right away. In mid-June 2003, Anna took B.J. and T.J. to Michigan to stay with Defendant's father and stepmother. Anna and Julie arrived in Vermont on July 7, 2003. There were problems with the move to Vermont, which included Julie's reluctance to live in the same home with children. Consequently, although the original plan was to leave the boys in Michigan for two weeks, the boys remained there for over two months. When the boys were finally moved to Vermont to be with Anna, arrangements were made for counseling at a center for sexually abused children. B.J. saw Ms. Ulrike Wasmus (Wasmus), M.A., for a little less than one year. Wasmus' expert testimony is one of Defendant's targets on appeal.

**Pretrial**

**{7}** Defense counsel filed motions in limine concerning Wasmus' anticipated testimony. In the motions, defense counsel argued that statements made to Wasmus by both B.J. and Anna should be precluded as improper hearsay and as more prejudicial than probative, and also that the qualifications of and diagnosis by Wasmus were subject to exclusion under *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579 (1993).

**{8}** At the hearing on the motions, Wasmus testified about her education and experience, as well as her diagnosis and treatment of B.J. Based on symptoms reported to her and based on criteria included in the Diagnostic and Statistical Manual of Mental Disorders IV (DSM), Wasmus vacillated between a diagnosis of post-traumatic stress disorder (PTSD) and adjustment disorder, but ultimately diagnosed B.J. with "adjustment disorder with a mixed disturbance of emotion and conduct." Wasmus testified that B.J. met all of the diagnostic criteria for adjustment disorder under the DSM. On cross-examination, Wasmus described the symptoms that are consistent with adjustment disorder as "mixed disturbance of emotion and conduct that speaks about depression and anxiety and also his intense anger issues." In Wasmus' opinion, her diagnosis was consistent with sexual abuse.

**{9}** Defense counsel challenged the qualifications of Wasmus, the foundation for her diagnosis, the soundness of the diagnosis under *Daubert*, her anticipated testimony as to consistency of her diagnosis with sexual abuse, and the hearsay statements made to Wasmus. In particular, defense counsel argued to the district court that Wasmus had concluded that B.J. had suffered sexual abuse even before she began to treat him, that Wasmus had not provided a basis for her conclusion that B.J.'s adjustment disorder was consistent with sexual abuse or the abuse of B.J., and that Wasmus' trial testimony would improperly refer to statements made to her by B.J. and Anna that would not fall under any exception to the rules regarding hearsay statements, including the Rule 11-803 NMRA exception permitting statements pertinent to diagnosis and treatment; and those statements would be more prejudicial than probative.

**{10}** The district court determined that Wasmus was qualified as an expert and would be

allowed to "testify. . . and form an opinion." The court also ruled that the hearsay statements at issue would be allowed pursuant to Rule 11-803 NMRA as statements "obtained by way of a patient therapist and were used by this witness for the purposes of determining her diagnosis and treatment." The court denied the motions in limine.

**{11}** We note that, for the most part, Defendant's arguments surrounded and primarily focused on Wasmus' qualifications and anticipated testimony that B.J.'s adjustment disorder was consistent with sexual abuse. Defendant did not specifically argue that Wasmus' anticipated testimony of B.J.'s identification of Defendant as the perpetrator was particularly prejudicial, as well as out of bounds and inadmissible under *State v. Alberico*, 116 N.M. 156, 861 P.2d 192 (1993), or *State v. Lucero*, 116 N.M. 450, 863 P.2d 1071 (1993). We also note that Defendant has not appealed from the court's ruling related to Wasmus' qualification to testify as an expert and render an opinion as to adjustment disorder, or from the court's ruling related to Wasmus' anticipated testimony that the adjustment disorder was consistent with sexual abuse.

**Trial**

**{12}** At trial, the prosecution presented fourteen witnesses, among whom were B.J., T.J., Anna, Julie, Wasmus; two witnesses who testified as to B.J.'s, T.J.'s, and Anna's truthfulness; and a second expert witness who testified that a normal medical examination is consistent with child abuse. Defendant did not testify, but he presented four witnesses who primarily testified about their interactions with and observations of Defendant with the boys and between the boys themselves, and about the fact that these witnesses saw nothing unusual, uncomfortable, or concerning. The jury found Defendant guilty of two counts of CSP involving B.J. and one count of CSP involving T.J. Defendant was sentenced to a total of fifty-four years in prison followed by two years of parole.

**Appeal**

**{13}** Defendant raises several issues on appeal. He asserts error in permitting Wasmus to repeat hearsay statements made to her by B.J. that Defendant actually committed sexual abuse. He asserts error in denying him the opportunity to put on an expert in the field of adjustment disorders. He further asserts that plain error occurred when the court permitted two witnesses to testify that Anna and the boys were truthful people who did not lie. In addition, he asserts that he was denied his constitutional right to effective assistance of counsel.

**DISCUSSION**

**Wasmus' Testimony**

**{14}** On direct examination, Wasmus relayed B.J.'s statement to her that Defendant was the perpetrator of the sexual abuse. A mental health provider's testimony that identifies the

4

perpetrator is highly prejudicial and generally out of bounds. *See Lucero*, 116 N.M. at 454, 863 P.2d at 1075; *Alberico*, 116 N.M. at 175, 861 P.2d at 211.

**{15}** Because Defendant failed to object to this testimony and also failed to specifically cover this identification-of-perpetrator testimony in his motion in limine, we review this issue for plain error and look at whether the testimony affected a substantial right of Defendant. *See Lucero*, 116 N.M. at 453, 863 P.2d at 1074. "We may take notice of plain errors affecting substantial rights although they were not brought to the attention of the district court." *State v. Gutierrez*, 2003-NMCA-077, ¶ 19, 133 N.M. 797, 70 P.3d 787 (alterations omitted) (internal quotation marks and citation omitted); *see* Rule 11-103(D) NMRA. Plain error is "an exception to the general rule that parties must raise timely objection to improprieties at trial," and therefore it is to be used sparingly. *State v. Torres*, 2005-NMCA-070, ¶ 9, 137 N.M. 607, 113 P.3d 877. We apply the rule only in evidentiary matters and "only if we have grave doubts about the validity of the verdict, due to an error that infects the fairness or integrity of the judicial proceeding." *Id.* (internal quotation marks and citation omitted); *see also United States v. Olano*, 507 U.S. 725, 736 (1993) (describing plain error as occurring when "the error seriously affect[s] the fairness, integrity or public reputation of judicial proceedings" (alteration in original) (internal quotation marks and citation omitted)); *State v. Baca*, 1997-NMSC-045, ¶ 17, 124 N.M. 55, 946 P.2d 1066 (stating that plain error requires "an injustice that creates grave doubts concerning the validity of the verdict"); *Lucero*, 116 N.M. at 453, 863 P.2d at 1074 (same). In determining whether "there has been plain . . . error, we must examine the alleged errors in the context of the testimony as a whole." *State v. Barraza*, 110 N.M. 45, 49, 791 P.2d 799, 803 (Ct. App. 1990).

**{16}** Wasmus' testimony clearly identified Defendant as the perpetrator of the abuse complained of by B.J. The State argues that there was no error in allowing Wasmus to repeat B.J.'s statements because B.J. was subject to cross-examination and because the statements were admissible under Rule 11-803(D) NMRA. Under that rule, hearsay statements "for purposes of medical diagnosis or treatment and describing medical history, or past or present symptoms, pain, or sensations, or the inception or general character of the cause or external source thereof insofar as reasonably pertinent to diagnosis or treatment" are generally admissible. *Id.*

**{17}** We see no legitimate basis for Wasmus to have repeated B.J.'s statements that identified Defendant as the perpetrator. Wasmus diagnosed B.J. after meeting with him three times, after observing a limited number of symptoms displayed by B.J., and after "listening to the story" from Anna. Wasmus' treatment focused on "trying to stabilize [B.J.] trying to feel safe again [and] trying to access some tools to help him with the stress that he was experiencing." According to Wasmus, B.J.'s statements were important to the treatment because the treatment is more successful if the child can "name the people and name the situations and name what has happened while processing the emotions connected to these events." However, the statements made by B.J. and repeated at trial by Wasmus were made to Wasmus by B.J. "[t]oward[] the end of [his] treatment." We are not informed of why

5

B.J.'s statements concerning the identity of Defendant were necessary to her diagnosis of adjustment disorder or to explain the basis of her opinion that adjustment disorder is consistent with sexual abuse. *See Lucero*, 116 N.M. at 455, 863 P.2d at 1076 (stating that repeating the alleged victim's statements made during the expert's evaluation "is too prejudicial because it amounts to an indirect comment on the alleged victim's credibility" and stating further that repeating the statements may not be necessary in explaining the basis for the expert's opinion).

**{18}** Even were the statements relevant to treatment, any relevance attributable to the statements appears to be minimal when compared to the risk of prejudice to Defendant, since credibility was an important issue given the theme of Defendant's defense that the boys' testimony resulted from suggestive statements to them by Anna and Julie. *See id.* at 456, 863 P.2d at 1077 (stating that "[b]ecause credibility was a pivotal issue in this case, it is likely that the jury was swayed by [the expert's] improper testimony"). Although statements made to a qualified therapist by the victim of alleged sexual abuse might, under certain circumstances, be admissible under the rules pertaining to exceptions to hearsay, the prejudicial impact is obvious and such testimony must be very carefully scrutinized before it is admitted, requiring persuasive reasons why probative value outweighs prejudice. *See id.* at 455, 863 P.2d at 1076 ("The prejudicial effect of recounting the complainant's statements . . . outweighed any probative value that they might have had.").

**{19}** However, in this case, the error in presenting this testimony did not, in our view, constitute plain error requiring reversal. Defendant has not persuaded us to have the grave doubts about the validity of the verdict required for us to hold that Defendant's substantial rights were affected. Nor are we persuaded that Wasmus' testimony infected the fairness and integrity of the trial. The circumstances here are not as egregious as those in *Lucero*, where our Supreme Court invoked plain error in determining that "[b]ecause [the expert] repeated so many of the complainant's statements regarding the alleged sexual abuse by the defendant and because she commented directly and indirectly upon the complainant's truthfulness, we have grave doubts concerning the validity of the verdict and the fairness of the trial." *Id.* at 456, 863 P.2d at 1077. In *Lucero*, on direct examination the expert not only recounted several statements of the victim, she commented directly on the victim's credibility, she named the perpetrator, and she testified that the victim's symptoms were in fact caused by sexual abuse. *Id.* at 454, 863 P.2d at 1075.

**{20}** In the present case, Wasmus' prejudicial testimony on direct was limited to three statements by B.J., and Wasmus testified to these only once. The statements according to Wasmus were that Defendant told B.J. to hold Defendant's penis, that B.J. was made to perform fellatio or oral sex with Defendant, and that Defendant made B.J. promise to keep the abuse a secret. We think that the mental health expert's prejudicial testimony on direct needs to be more extensive, as in *Lucero*, to give rise to plain error. Looking at the case as a whole, we are unable to say that the error here rose to the level of concern as did the testimony in *Lucero*.

6

**Denial of Expert Witness**

**{21}**     After a lengthy cross-examination about various stressors other than sexual abuse that could lead to a diagnosis of adjustment disorder, defense counsel asked Wasmus, "In fact, you can't say . . . today that sexual abuse caused the adjustment disorder in [B.J.'s] case, right?"  Wasmus responded that "[i]n [her] professional opinion[,] it did."  Defense counsel objected to the answer and asserted that Wasmus was prohibited by New Mexico law from concluding that sexual abuse was the cause of the adjustment disorder.  Defense counsel requested a mistrial, but that request was denied, and the court gave a curative instruction to the jury to "disregard the last statement made by [Wasmus]."  In addition to a curative instruction, defense counsel wanted the "opportunity to call an expert of [his] own choosing to testify regarding whether or not anybody could determine the actual cause of the psychological disorder" and to otherwise rebut Wasmus' testimony on adjustment disorder.

**{22}**     Defense counsel indicated that in asking his question he did not mean for Wasmus to testify as she did but instead "wanted her to say, no, I can't say that."  He explained to the court that, based on a previous conversation with the prosecutor, he had expected Wasmus to testify about PTSD, a well-recognized disorder under New Mexico law, but thought that she knew that she "couldn't state the cause of [the PTSD]."  Defense counsel evidently believed that the State would have told the expert that she was not allowed to testify on causation.  Defense counsel appears to have acknowledged in discussion with the district court that asking the question was a tactical error on his part, in stating, "And maybe that was a tactical error on my part and evidently it was[.]"

**{23}**     In addition, defense counsel stated to the district court that, after being told that the diagnosis made by Wasmus was adjustment disorder instead of PTSD, he presumed that Wasmus would testify about "well-documented things that can cause adjustment disorder."  Instead, according to counsel, Wasmus "proceeded to say that a lot of the things that are well-documented causes of adjustment disorder are not causes of adjustment disorder" and to disagree with portions of the DSM.  It was also on these points that Defendant wanted to present an expert.

**{24}**     The district court denied Defendant's request for an expert, stating that the jury instructions inform the jury that an expert opinion is to be given no more credence or weight than lay witness testimony, that expert testimony would not be helpful to the jury because defense counsel did an effective job in cross-examining Wasmus, and that expert testimony would not assist the jury because no expert would have "specific information regarding . . . [B.J.] and would not be able to dispute the opinion of the expert witness as to that witness' theory or diagnosis."

**{25}**     In our view, defense counsel either employed a conscious, risky strategy or was not careful.  Whichever it was, it is difficult to countenance the course counsel took.  *See Alberico*, 116 N.M. at 176, 861 P.2d at 212 (stating that an expert is not permitted to state an opinion that an alleged victim's symptoms were caused by sexual abuse as this type of

7

testimony allows the expert to vouch for the alleged victim's credibility, and also allows the expert to provide testimony that is not "grounded in scientific principle"); *see also Alberico,* 116 N.M. 176, 861 P.2d 212; *Lucero*, 116 N.M. at 454, 863 P.2d at 1075 (citing *Alberico*, 116 N.M. at 176, 861 P.2d at 212, for the ruling that an "expert may not testify that the victim's PTSD symptoms were in fact caused by sexual abuse"). And it is also difficult to support Defendant's position that he was deprived of the opportunity to put on his defense by calling an expert mid-trial when he opened the issue and invited the error. Furthermore, Defendant nowhere shows that defense counsel was unable to anticipate Wasmus' testimony about adjustment disorder and nowhere shows that defense counsel could not have had an expert available and ready to testify as a part of the defense. The court in fact stated that "the defense certainly had an opportunity to bring an expert." Moreover, Defendant did not have an expert ready to rebut Wasmus' testimony. The furthest Defendant went was only to state essentially that a psychologist who testifies in these cases would likely be able to testify in a way that would question the accuracy of Wasmus' conclusions about adjustment disorder.

**{26}** To the extent Defendant claims on appeal that his counsel was unable to adequately prepare for trial or prepare an expert for trial because of Wasmus' late change of diagnosis from PTSD to adjustment disorder, we are unpersuaded. Counsel could have sought a continuance. Besides, he was on notice of the need to rebut Wasmus' actual diagnosis and her anticipated testimony with regard to whether any other stressors than sexual abuse could have caused the disorder. Before trial, on Defendant's motion in limine relating to Wasmus' anticipated testimony, the court asked defense counsel if he had an expert that was going to challenge Wasmus' opinion, and defense counsel replied only, "I'm challenging her opinion now and we will see where we get with it." In Defendant's ineffective assistance argument in this appeal, Defendant in fact concedes that his counsel should have known that a defense expert would be necessary to correct what Wasmus would testify to and that counsel did not have an expert ready to testify at trial. Finally, assuming that his causation question was a conscious, strategic ploy, he had to have been aware and should have anticipated that his causation question could backfire necessitating rebuttal by an expert.

**{27}** There is little question that Wasmus' testimony was prejudicial. However, where it appears defense counsel made a conscious choice not to have his own expert ready to testify in rebuttal, we will not require an abuse of discretion reversal for refusal mid-trial to allow Defendant the opportunity to attempt to locate an expert either to rebut the causation testimony or to testify generally on adjustment disorder.

**Testimony of Witnesses on Truthfulness**

**{28}** Defendant argues that the district court committed plain error when two witnesses were allowed to testify as to the truthfulness of Anna, B.J., and T.J. even though Defendant had not directly claimed they were not truthful, but claimed only that the statements of the boys were misunderstood and their memories were shaped by suggestion and influence.

**{29}** One witness was asked if he had an opinion as to whether he believed Anna was a

truthful and honest person, and he responded, "I believe she is a truthful and honest person." The witness also was asked, "based on your interactions with the kids, are you able to give an opinion as to whether . . . you believe that they are truthful or untruthful?" The witness stated that he had "never known them to say anything untruthful." Another witness was asked, based on his daily activity with the boys, whether the boys "had a reputation for truthfulness or untruthfulness . . . in regard[] to generally speaking?" The witness responded, "[g]enerally speaking the boys were never untruthful to [him]." After this response, defense counsel objected, the court overruled the objection, and there was no further discussion related to the propriety of the questioning of this witness as to truthfulness. Immediately after the foregoing exchange, the witness volunteered that "[t]here had never been a time where [the boys] had lied about something major or, you know, they were never liars is what I'm saying." Defense counsel did not attempt any further objection.

**{30}** In our view, Defendant did not preserve an objection to any of the aforementioned truthfulness testimony. *Barraza*, 110 N.M. at 49, 791 P.2d at 803 (stating that "an objection that does not state the grounds for the objection preserves no issue for appeal"); *see* Rule 11-103(A)(1). We therefore review, as Defendant asks, for plain error. We set out the plain error standard earlier in this opinion.

**{31}** Rule 11-608(A)(2) NMRA allows admission of evidence of a witness's character for truthfulness "only after the character of the witness for truthfulness has been attacked by opinion or reputation evidence or otherwise." In the present case, the State asserts that the theory of the defense was in and of itself an attack on the character for truthfulness of Anna and the boys. That theory appears to have first surfaced in defense counsel's opening statement. The issue, then, is whether counsel's statement constituted an attack on the character for truthfulness of B.J., T.J., and Anna. *See, e.g.*, *Pierson v. Brooks*, 768 P.2d 792, 795 (Idaho Ct. App. 1989) (construing the phrase "or otherwise" in a rule similar to Rule 11-608(A)(2) to include situations where a witness's character is attacked by questions that are directed at an issue in the case, but constitute an indirect attack and have the actual effect of impugning the witness).

**{32}** In his opening statement, defense counsel stated that Anna herself had experiences of abuse that colored her perception, that she "suggested a lot of things" to B.J., that "suggesting was going on" over a long period of time with the boys, and that the boys parroted comments they heard from Julie. Defense counsel also stated that "some of the things that were said by the [boys] could not have occurred in reality." During defense counsel's cross-examination of Anna and Julie, he sought to establish evidence that they had assisted the boys with development of a story. It is a close call whether these opening statements and line of questioning can be considered attacks on the character of Anna and the boys for truthfulness. However, even were we to determine that the statements did not constitute such an attack, we are not prepared to hold that the truthfulness testimony affected a substantial right of Defendant sufficient to require reversal based on plain error. The testimony did not, in our view, seriously affect the fairness or integrity of the trial, nor does it create grave doubts concerning the validity of the verdict. Defendant had ample

9

opportunity to cross-examine witnesses, and took the opportunity to advance the theory that the boys' testimony was not credible because Anna and Julie were improperly, if not falsely, suggestive and influential. We hold that admission of the truthfulness testimony did not affect Defendant's substantial rights, and therefore there was no plain error in this case to allow the witnesses' testimony as to character for truthfulness.

**Ineffective Assistance of Counsel**

**{33}** We review claims of ineffective assistance of counsel de novo. *State v. Boergadine*, 2005-NMCA-028, ¶ 33, 137 N.M. 92, 107 P.3d 532; *see State v. Martinez*, 2007-NMCA-160, ¶ 19, 143 N.M. 96, 173 P.3d 18 (stating that a claim of ineffective assistance of counsel presents a mixed question of law and fact, which is reviewed de novo).

**{34}** On appeal, Defendant points to several perceived omissions by his trial counsel in support of his claim that he was denied effective assistance of counsel. For example, Defendant claims that counsel:

[1]     fail[ed] to request a [b]ill of [p]articulars even though the indictments in this case covered a six-month period and located the crimes only within the State of New Mexico, with no greater specificity having been provided;

[2]     fail[ed] to argue (based on *Lucero* . . .) that damaging and improper hearsay and expert evidence should have been excluded;

[3]     fail[ed] to retain an expert to testify about the effects of Anna's suggestive questioning of her children and the effect such questioning could have had on their reports;

[4]     fail[ed] to retain an expert to testify about the [S]tate's expert's lack of qualifications or basis for her opinions even though the trial court highlighted for counsel the need for such an expert;

[5]     fail[ed] to notice that the State's expert intended to testify that [B.J.] suffered from [a]djustment [d]isorder, rather than PTSD;

[6]     agree[d] to have [T.J.'s] pre-trial interview played to the jury, even though [T.J.] provided more concrete claims on the tape than he did during his trial testimony . . .;

[7]     fail[ed] to object to hearsay statements made by Anna even though these statements did not fit within any hearsay exception and lacked reliability;

10

[8]     fail[ed] to object when the State inquired of its witnesses whether they considered Anna and the boys to be truthful;

[9]     agree[d] with the prosecution that the jurors be told they could not have a readback of testimony when asked by the jury about the significance of the starting date listed in the indictment . . .[;]

Even worse, [defense] counsel actively undermined his two critical missions by:

[10]    himself eliciting testimony from the State's expert that she believed [B.J.'s] disorder was the result of sexual abuse . . . ;

[11]    eliciting from [B.J.] the statement, never made on direct, that [B.J.] had seen [Defendant] do things to [T.J.], thereby opening the door for the State to elicit from [B.J.] on redirect that he had seen [Defendant] put his penis in [T.J.'s] mouth and bottom . . . .

**{35}**     To set out the manner in which we are to determine how to address an ineffective assistance of counsel claim asserted on appeal by a defendant who has been convicted in a trial, we piece together statements from several cases. First and foremost, "[t]he Sixth Amendment to the United States Constitution, applicable to the states through the Fourteenth Amendment, guarantees . . . the right to the effective assistance of counsel." *Patterson v. LeMaster*, 2001-NMSC-013, ¶ 16, 130 N.M. 179, 21 P.3d 1032 (internal quotation marks and citation omitted). The guarantee is to ensure fairness during all critical stages of the proceedings. *Id*.

**{36}**     To evaluate a claim of ineffective assistance of counsel, we apply the two-prong test in *Strickland v. Washington*, 466 U.S. 668, 687 (1984); *State v. Grogan*, 2007-NMSC-039, ¶¶ 11, 24, 142 N.M. 107, 163 P.3d 494; *State v. Bernal*, 2006-NMSC-050, ¶ 32, 140 N.M. 644, 146 P.3d 289. That test places the burden on the defendant to show that his counsel's performance was deficient and that the deficient performance prejudiced his defense. *See Grogan*, 2007-NMSC-039, ¶¶ 11, 24.

**{37}**     Defense counsel's performance is deficient if it falls below an objective standard of reasonableness. *Id*. ¶ 24. Stated another way, the performance is deficient if defense counsel's conduct falls below that of a reasonably competent attorney. *Id*. ¶ 11. "[J]udicial review of the effectiveness of counsel's performance must be highly deferential, and courts should recognize that counsel is strongly presumed to have rendered adequate assistance and made all significant decisions in the exercise of reasonable professional judgment." *Lytle v. Jordan*, 2001-NMSC-016, ¶ 50, 130 N.M. 198, 22 P.3d 666 (internal quotation marks and citation omitted); *see also State v. Roybal*, 2002-NMSC-027, ¶ 21, 132 N.M. 657, 54 P.3d 61 (stating that an appellate court presumes that counsel's performance "fell within a wide range of reasonable professional assistance" (internal quotation marks and citation omitted)). "We indulge a strong presumption that counsel's conduct falls within the wide range of

11

reasonable professional assistance; that is, the defendant must overcome the presumption that, under the circumstances, the challenged action might be considered sound trial strategy." *State v. Hunter*, 2006-NMSC-043, ¶ 13, 140 N.M. 406, 143 P.3d 168 (internal quotation marks and citation omitted). The inquiry into reasonableness "must take into account all of the circumstances surrounding the defense." *Lytle*, 2001-NMSC-016, ¶ 26.

**{38}** A defense is prejudiced if, as a result of the deficient performance, "there was a reasonable probability that . . . the result of the trial would have been different." *Id*. ¶ 29. Stated another way, "[c]ounsel's deficient performance must represent so serious a failure of the adversarial process that it undermines judicial confidence in the accuracy and reliability of the outcome." *Roybal*, 2002-NMSC-027, ¶ 25. Thus, on appeal, the court must determine that there is "a reasonable probability that, absent the errors, the factfinder would have had a reasonable doubt respecting guilt." *Id.* (internal quotation marks and citation omitted). A "reasonable probability" is one that is "sufficient to undermine confidence in the outcome." *Id.* (internal quotation marks and citation omitted). "[M]ere evidentiary prejudice is not enough." *Id.* Nevertheless, a defendant can be relieved of the burden of showing prejudice under certain circumstances, one of which is when he is denied the right of effective cross-examination. *See Grogan*, 2007-NMSC-039, ¶ 12.

**{39}** On appeal, we examine the merits of each of the contentions and examine whether Defendant has established that the facts support his position. *Hunter*, 2006-NMSC-043, ¶ 15. However,

> when the record does not contain all the facts necessary for a full determination of the issue, an ineffective assistance of counsel claim is more properly brought through a habeas corpus petition, although an appellate court may remand a case for an evidentiary hearing if the defendant makes a prima facie case of ineffective assistance.

*State v. Paredez*, 2004-NMSC-036, ¶ 22, 136 N.M. 533, 101 P.3d 799 (internal quotation marks and citation omitted). A defendant makes a prima facie case of ineffective assistance despite full and adequate factual support in the record "by showing that defense counsel's performance fell below the standard of a reasonably competent attorney and, due to the deficient performance, the defense was prejudiced." *Patterson*, 2001-NMSC-013, ¶ 17 (internal quotation marks and citation omitted). However, when applying the deficient-performance test, the appellate court does not second-guess defense counsel's strategic decisions. *Lytle*, 2001-NMSC-016, ¶ 43; *Patterson,* 2001-NMSC-013, ¶ 17. "A claim of ineffective assistance . . . does not present an opportunity for hindsight review." *Lytle*, 2001-NMSC-016, ¶ 50. If there is a plausible, rational strategy or tactic to explain counsel's conduct, a prima facie case for ineffective assistance is not made. *Id.* ¶ 26. Stated in another way, "if on appeal we can conceive of a reasonable trial tactic which would explain the counsel's performance, we will not find ineffective assistance." *Roybal*, 2002-NMSC-027, ¶ 21.

**{40}** "New Mexico appellate courts frequently remand claims of ineffective assistance of counsel brought on direct appeal for further evidentiary hearings." *Grogan*, 2007-NMSC-039, ¶ 9; *Hunter*, 2006-NMSC-043, ¶ 30 (stating that our appellate courts "frequently remand direct appeals alleging ineffective assistance of counsel for further evidentiary hearings"). We are reluctant to attempt to decide the issue when we do not have before us all of the facts needed for an informed decision. *Hunter*, 2006-NMSC-043, ¶ 30; *State v. Swavola*, 114 N.M. 472, 475, 840 P.2d 1238, 1241 (Ct. App. 1992) ("Recent decisions by this [C]ourt have expressed our reservations about deciding claims of ineffective assistance of counsel in the absence of a district court evidentiary hearing on the matter.").

**{41}** We note that in *Duncan v. Kerby*, 115 N.M. 344, 346, 851 P.2d 466, 468 (1993), our Supreme Court stated that Rule 5-802 NMRA habeas corpus proceedings are the "preferred avenue for adjudicating ineffective assistance of counsel claims." In *Duncan*, the Court stated the rationale behind this preference to be

> that even assuming that a criminal defendant has a new attorney to handle his direct appeal, the record before the trial court may not adequately document the sort of evidence essential to a determination of trial counsel's effectiveness because conviction proceedings focus on the defendant's misconduct rather than that of his attorney. Consequently, an evidentiary hearing on the issue of trial counsel's effectiveness may be necessary.

115 N.M. at 346-47, 851 P.2d at 468-69. The Court noted that, while the hearing could occur through a remand to the district court "during direct appeal when unusual circumstances exist," habeas corpus was the "procedure of choice" because that process was "specifically designed to address such postconviction constitutional claims." *Id.* at 347, 851 P.2d at 469; *see also Grogan*, 2007-NMSC-039, ¶ 9 (recognizing *Hunter*, 2006-NMSC-043, ¶ 30, which quotes *Duncan*, 115 N.M. at 346, 851 P.2d at 468, for the notion that "[h]abeas corpus proceedings are the preferred avenue for adjudicating ineffective assistance of counsel claims, because the record before the trial court may not adequately document the sort of evidence essential to a determination of trial counsel's effectiveness"). We further note that our Supreme Court has indicated that "[t]he Court[] of Appeals has been reluctant to rule on the effectiveness of counsel without a fully developed record and has recognized that a remand might usurp [the Supreme] Court's role in habeas proceedings under Rule 5-802." *Hunter*, 2006-NMSC-043, ¶ 30.

**{42}** We read our Supreme Court jurisprudence as acknowledging this Court's discretion to remand a case for an evidentiary hearing where a defendant has made a prima facie case of ineffective assistance. *See Paredez*, 2004-NMSC-036, ¶ 22. We have stated that we "limit remand to those cases in which the record on appeal establishes a prima facie case of ineffective assistance." *Swavola*, 114 N.M. at 475, 840 P.2d at 1241. Of course, whether this Court remands or leaves the issue for habeas corpus relief, it is most important to have trial judges assess performance, since appellate courts in most cases should not attempt to "reconstruct the circumstances of counsel's conduct, . . . evaluate counsel's conduct at the

13

time, and deal[] with the effects of that conduct without the distorting effects of hindsight." *Grogan,* 2007-NMSC-039, ¶ 10 (internal quotation marks and citation omitted); *see also Strickland*, 466 U.S. at 689 ("A fair assessment of attorney performance requires that every effort be made to eliminate the distorting effects of hindsight, to reconstruct the circumstances of counsel's challenged conduct, and to evaluate the conduct from counsel's perspective at the time.").

**{43}** All of the circumstances that Defendant asserts show ineffective assistance involve allegations of counsel's actions and failures to act. None involve court error in evidentiary rulings or otherwise. Defendant has raised troubling questions. There exist unexplained instances in which defense counsel did not object to clearly prejudicial hearsay testimony of Wasmus regarding Defendant as the perpetrator and to the character witnesses when it appears he should have. There exists no indication why he did not retain and use or have available a defense expert to question or rebut Wasmus' testimony as to her qualifications to testify as a therapist with a master's degree, to diagnose adjustment disorder, to conclude that adjustment disorder was consistent with sexual abuse, and to testify in a manner on direct that could easily lead the jury to believe that, in her opinion, there was sexual abuse and it caused the adjustment disorder. Defense counsel also took what appears to have been an unnecessary, as well as improvident and imprudent risk in outright asking Wasmus to give an opinion on causation. Given that this appears to have been a tactic of defense counsel, one must question the wisdom of deferring to or not second-guessing that tactic in this case. Further, counsel's allowance of damaging pretrial statements of A.J. and his cross-examination of B.J. raise similar issues as to whether counsel's approach was based on tactics or correctness. We are not judging counsel's actions by any means. We are simply raising issues that, we believe, are in need of further evidentiary inquiry. We have not addressed other instances of deficient performance claimed by Defendant, but they too should be aired in an evidentiary hearing.

**{44}** Defendant argues that both the individual instances of deficient performance and the cumulative effect of all instances considered together are sufficient to establish that the counsel's performance fell below acceptable standards and that the cumulative effect of the errors deprived him of a fair trial. The doctrine of cumulative error is strictly applied, and reversal is required when the effect of the cumulation of error is so prejudicial as to deprive a defendant of his or her fundamental right to a fair trial. *See Roybal*, 2002-NMSC-027, ¶ 33 (holding that, in response to the defendant's argument regarding "the cumulative effect of the oversight of his counsel, the prosecutor, and the trial court," the doctrine of cumulative error "should not apply where . . . [the d]efendant only complains of one error but attributes multiple sources to its cause and where [the d]efendant had a fair trial"); *Boergadine*, 2005-NMCA-028, ¶ 38 (holding that, in response to the defendant's claim that the appellate court "should apply the doctrine of cumulative error to the actions of his trial counsel" and of the court for not limiting trial counsel's errors, the defendant "was not prejudiced to the point that he did not receive a fair trial"); *State v. Garvin*, 2005-NMCA-107, ¶ 14, 138 N.M. 164, 117 P.3d 970 (explaining that the doctrine of cumulative error, while applied strictly, requires reversal of a defendant's conviction where the impact of cumulative error is so

14

prejudicial that the defendant did not receive a fair trial).

**{45}** We do not rule out that if defense counsel's conduct was deficient in more than one way, cumulatively the deficiencies would have had such an adverse impact as to deny Defendant a fair trial. However, we are not at all comfortable determining from the record, under the strict standards and presumption of competency that govern the issue of ineffective assistance of counsel, whether defense counsel's performance was deficient and whether any deficiency individually or any deficiencies cumulatively resulted in prejudice to Defendant. Defendant's presentation on appeal begs for an evidentiary hearing; however, in this case we hold that Defendant has established a prima facie case for ineffective assistance such that we should, and we do, remand to the district court to hold an evidentiary hearing on ineffective assistance of counsel and to rule on the issue.

**Adjustment Disorder Testimony**

**{46}** We think it important and useful for future cases to briefly discuss the diagnosis of adjustment disorder in sexual abuse cases. New Mexico courts have clearly accepted the scientific validity of PTSD and have accepted testimony that PTSD is consistent with sexual abuse. *See*, *e.g.*, *Alberico*, 116 N.M. at 173-74, 861 P.2d at 208-10. In the present case, Wasmus appears to have testified that she was able to deduce from the DSM that adjustment disorder is consistent with sexual abuse. However, she referred to no literature in the area and gave no clear explanation of a connection.

**{47}** We have not located a decision that has allowed testimony that adjustment disorder is consistent with sexual abuse or that has even discussed the issue. *Alberico* lists several criteria for admitting scientific evidence under *Daubert*, including that the technique is grounded in traditional psychiatric or psychological principles, that it is generally accepted, and that specialized literature addressing validity is available. *See Alberico*, 116 N.M. at 168, 861 P.2d at 203-04. In future cases, if this same issue arises, the district court should give especially careful scrutiny as to whether adjustment disorder passes muster under *Daubert* on the question whether it is or can be consistent with sexual abuse.

**CONCLUSION**

**{48}** We affirm Defendant's convictions, and we remand for an evidentiary hearing and ruling on Defendant's claims of ineffective assistance of counsel.

**{49}   IT IS SO ORDERED.**

 

**JONATHAN B. SUTIN, Judge**

**WE CONCUR:**

15

**JAMES J. WECHSLER, Judge**


**RODERICK T. KENNEDY, Judge**


**Topic Index for *State v. Dylan J.*, Nos. 26,131/26,562**

| | |
|---|---|
| **AE** | **Appeal and Error** |
| AE-CE | Cumulative Error |
| AE-PE | Plain Error |
| AE-RM | Remand |
| | |
| **AT** | **Attorneys** |
| AT-EA | Effective Assistance of Counsel |
| | |
| **CD** | **Children** |
| CD-PS | Psychological Evaluation |
| | |
| **CL** | **Criminal Law** |
| CL-CN | Child Abuse and Neglect |
| CL-CP | Criminal Sexual Penetration |
| | |
| **CA** | **Criminal Procedure** |
| CA-EA | Effective Assistance of Counsel |
| CA-EH | Evidentiary Hearing |
| CA-EX | Expert Witness |
| CA-ML | Motion in Limine |
| CA-CW | Children as Witness |
| | |
| **EV** | **Evidence** |
| EV-CE | Character Evidence |
| EV-EW | Expert Witness |
| EV-HR | Hearsay Evidence |
| EV-PB | Probative Value vs. Prejudicial Effect |
| EV-SC | Scientific Evidence & Daubert Standard |