This memorandum opinion was not selected for publication in the New Mexico Appellate Reports. Please see Rule 12-405 NMRA for restrictions on the citation of unpublished memorandum opinions. Please also note that this electronic memorandum opinion may contain computer-generated errors or other deviations from the official paper version filed by the Court of Appeals and does not include the filing date.

# IN THE COURT OF APPEALS OF THE STATE OF NEW MEXICO

**STATE OF NEW MEXICO,**

 Plaintiff-Appellee,

v. **NO. 33,908**

**JOE RIVERA,**

 Defendant-Appellant.

**APPEAL FROM THE DISTRICT COURT OF SANTA FE COUNTY**
**Mary Marlowe Sommer, District Judge**

Hector H. Balderas, Attorney General
Maris Veidemanis, Assistant Attorney General
Santa Fe, NM

for Appellee

Bennett J. Baur, Chief Public Defender
Kimberly Chavez Cook, Assistant Appellate Defender
Santa Fe, NM

for Appellant

**MEMORANDUM OPINION**

**WECHSLER, Judge.**

{1}     Defendant Joe Rivera appeals from his convictions for second degree murder, contrary to NMSA 1978, Section 30-2-1(B) (1994), voluntary manslaughter, contrary to NMSA 1978, Section 30-2-3(A) (1994), tampering with evidence, contrary to NMSA 1978, Section 30-22-5 (2003), and conspiracy to commit tampering with evidence, contrary to Section 30-22-5 and NMSA 1978, Section 30-28-2 (1979). Defendant asserts that various evidentiary errors, as well as the district court's failure to give a jury instruction specifically tailored to Defendant's multiple-assailant theory, require reversal. For the reasons discussed herein, Defendant's claims of error lack merit and, therefore, we affirm.

**BACKGROUND**

{2}     On the evening of December 25, 2012, Ronnie Montano invited Defendant's then-girlfriend, Cassandra Valencia, to a party at the home of John Griego. Defendant, his stepbrother Isaac Cordova, Selena Valencia, and two other acquaintances accompanied Cassandra to the party. Selena drove Defendant's group to the party in her vehicle. Montano met the group in the driveway upon their arrival. The arrival of Defendant's group upset Griego, and the atmosphere at the party was tense. Defendant's group stayed at the party for a while but then decided to leave. They negotiated the purchase of a bottle of liquor from Griego prior to departing.

{3} Defendant's group exited the house after purchasing the liquor. As Cordova walked through the carport toward Selena's vehicle, he was shoved by one of Griego's friends, Nick Baker. Defendant moved to help Cordova and began to fight with Baker. Defendant was pushed or thrown to the ground, at which point he shot Baker and Griego.[1] Baker was shot once in the chest. Griego was shot twice: once in the chest and once in the pelvic area. Both Baker and Griego died from their wounds.

{4} After the shooting, Defendant ran down the road and entered Selena's vehicle. Defendant, Cordova, and Cassandra exited the vehicle at an automotive shop and proceeded to a nearby apartment. They stayed at the apartment that evening and left the next day.

{5} Defendant was arrested on December 31, 2012. That same day, Santa Fe County Sheriff's Department Detectives Paul Colombe and Andrew Quintana interviewed Defendant. As Detective Colombe was reading the *Miranda* warnings, Defendant interrupted and asked if the detectives "could call my lawyer—Dan Marlowe?" Detective Colombe finished reading the *Miranda* warnings and then posed additional questions to Defendant. Following these questions, Defendant agreed to speak to the detectives. He signed a *Miranda* waiver and gave a statement to the

---

[1]Defendant testified that he noticed a gun on the ground after falling, which he proceeded to pick up and fire. Other testimony indicated that Defendant may have had a gun on his person throughout the evening.

3

detectives, during which he stated on numerous occasions that he threw away the gun and the jersey he was wearing while running away from the scene. The State introduced a video recording of Defendant's statement at trial.

{6}     Defendant made phone calls to friends and family members while incarcerated prior to trial. These calls were recorded by the phone system at the Santa Fe County jail. Upon request of the Santa Fe County Sheriff's Department, the Santa Fe County Department of Corrections produced recordings of Defendant's phone calls. The State introduced these audio recordings at trial.

{7}     In addition to testimony from witnesses who attended the party, the State offered expert witness testimony related to the trajectory of the bullets that killed Baker and Griego. New Mexico State Police Crime Scene Investigator Clay Goret (Agent Goret) was the primary expert witness on this topic. The district court qualified Agent Goret as an expert in crime scene reconstruction, including bullet trajectory analysis as "a portion of crime scene reconstruction." Agent Goret testified that, in his opinion, Griego was shot once while standing up and once while lying on the ground. He also utilized computer-generated simulations to demonstrate to the jury the possible and likely positions of Defendant and Griego at the time each shot was fired. Defendant did not object to the admission of these computer-generated simulation exhibits at trial.

**{8}** After testimony concluded, the district court instructed the jury regarding Defendant's claim that he shot Baker and Griego in self-defense or in defense of another. Defendant did not object to the jury instructions as given or request a jury instruction specifically tailored to the issue of self-defense against multiple assailants.

**{9}** The jury convicted Defendant of voluntary manslaughter for the killing of Baker and second degree murder for the killing of Griego. It also convicted Defendant of tampering with evidence and conspiracy to commit tampering. This appeal resulted.

**ALLEGATIONS OF EVIDENTIARY ERROR**

**{10}** Defendant argues on appeal that the district court's admission of certain evidence constituted reversible error. These alleged evidentiary errors include the admission of (1) a video recording of a statement obtained in violation of Defendant's *Miranda* right to counsel; (2) audio recordings of Defendant's phone calls from jail; (3) expert witness testimony by Agent Goret related to bullet trajectory; and (4) computer-generated simulation exhibits associated with Agent Goret's testimony. We review the district court's admission of evidence for abuse of discretion. *State v. Thompson*, 2009-NMCA-076, ¶ 11, 146 N.M. 663, 213 P.3d 813. "An abuse of discretion occurs when the [district court's] ruling is clearly against the logic and effect of the facts and circumstances of the case." *Id.* (internal quotation marks and citation omitted).

5

*Miranda* **Right to Counsel**

{11} Defendant claims that the district court admitted evidence obtained in violation of his *Miranda* right to counsel. This claim raises the possibility of constitutional error, which is harmless only if there is "no reasonable possibility" that the error contributed to the defendant's conviction. *State v. Tollardo*, 2012-NMSC-008, ¶ 32, 275 P.3d 110 (internal quotation marks and citation omitted). After his arrest, Defendant was interviewed by Detectives Colombe and Quintana. During Detective Colombe's recitation of the *Miranda* warnings, Defendant interrupted and asked, "Do you think you could call my lawyer—Dan Marlowe?" Defendant argues that this request constituted an unequivocal invocation of his *Miranda* right to counsel, which necessitated that the detectives immediately terminate the interview. The State argues in response that, regardless of the initial effect of Defendant's request, he then validly waived his right to counsel prior to giving his statement to the detectives.

{12} We believe that the facts present a close question as to whether Defendant's statement resulted from a violation of his constitutional rights. However, Defendant has not demonstrated in his briefing how the admission of his statement to the detectives prejudiced his defense. The harmless error rule provides that "[i]mproperly admitted evidence is not grounds for a new trial unless the error is determined to be harmful." *Tollardo*, 2012-NMSC-008, ¶ 25. "[A]n error without prejudice is always

harmless error." *State ex rel. Nw. Colonization & Improvement Co. of Chihuahua v. Huller*, 1918-NMSC-001, ¶ 27, 23 N.M. 306, 168 P. 528. To justify reversal due to constitutional error, "the defendant has the burden to demonstrate prejudice." *State v. Holly*, 2009-NMSC-004, ¶ 28, 145 N.M. 513, 201 P.3d 844. Even if we assume that the district court's admission of the evidence constituted error, because Defendant has not demonstrated how such error prejudiced his defense, we must conclude that any error was harmless. However, because we consider a confession to a homicide to be inherently prejudicial under most circumstances, we provide additional discussion for the benefit of the parties.

{13}     Defendant testified, consistent with his statement to the detectives, that he fired shots during an altercation with Baker and Griego and threw the gun away as he fled the scene on foot. Defendant also testified, again consistent with his statement to the detectives, that he believed that he only fired two shots. Because Defendant's trial testimony was cumulative to his statement to the detectives, it is difficult to say what effect its admission had on the jury's verdict. *See State v. Johnson*, 2004-NMSC-029, ¶ 37, 136 N.M. 348, 98 P.3d 998 ("[I]mproperly admitted evidence that is cumulative is not *ipso facto* harmless beyond a reasonable doubt: the reviewing court must further inquire into the *effect* that evidence might have had on the jury's verdict."). Certainly the prejudicial effect of the statement itself is diminished by Defendant's

7

corroborating testimony. However, the admission of such evidence could conceivably have impacted Defendant's trial strategy—specifically by compelling Defendant to either (1) testify at trial or (2) testify in a certain manner at trial. We address these issues in turn.

{14} The record before this Court indicates that Defendant intended to testify at trial regardless of whether the district court admitted his statement into evidence. In opening statements, defense counsel stated that the jury was going to hear certain testimony related to the events of the evening, including even statements made by Baker and Griego in the carport during the altercation. Defendant, however, did not disclose any witnesses through which to introduce such testimony. *See* Rule 5-502(A)(3) NMRA (requiring a defendant to disclose "the names and addresses of the witnesses the defendant intends to call at the trial"). As such, the only way for Defendant to introduce the promised testimony was to testify himself.

{15} Furthermore, inasmuch as the suppression of Defendant's statement to the detectives would allow Defendant to strategically tailor the substance of his testimony, any inconsistencies between his trial testimony and his statement to the detectives would have been admissible as impeachment evidence. *See State v. Southworth*, 2002-NMCA-091, ¶ 29, 132 N.M. 615, 52 P.3d 987 (holding that statements obtained in violation of *Miranda* may still be used for impeachment purposes). As such, any

8

argument that Defendant could protect his credibility with the jury by tailoring his testimony to be consistent with that of other witnesses at trial would lack merit.

{16}     Defendant has not met his burden to demonstrate that the alleged error prejudiced his defense. Additionally, although not central to our ruling, our independent analysis does not lead to the conclusion that the alleged error prejudiced Defendant. Therefore, any error by the district court in admitting the evidence was harmless and did not constitute an abuse of discretion.

**Authentication of Phone Calls**

{17}     Defendant next claims that the district court admitted recordings of his phone calls from the Santa Fe County jail in violation of Rule 11-901 NMRA. Defendant concedes on appeal that sufficient evidence supports a finding, under Rule 11-901(B)(5), that his voice is heard on each recording.

{18}     After authenticating Defendant's voice through Detective Quintana's testimony, the State called Jose Villegas, a former special project administrator with the Santa Fe County Corrections Department. Villegas testified that every user of the phone system at the jail is assigned a PIN number. Villegas further testified that, upon request from the Santa Fe County Sheriff's Department, he "went into the system, looked at the PIN number, . . . identified the name to the PIN number, looked for the date that they wanted, made a copy, [and] burned a copy of the CD[.]" Villegas was unable to recall

9

the dates and times on which Defendant's phone calls occurred. Each admitted recording contained a computer-generated preamble, which states, "Hello. This is a prepaid collect call from _____,[2] an inmate at Santa Fe County jail. This call is subject to recording and monitoring. To accept charges, press one. To refuse charges, press two. Thank you for using Securus."

{19} Over objection, the district court admitted the recordings, stating,

> I'm not so concerned about the item of evidence being his voice. I'm concerned about the item of evidence being the jail—the jail—his jail phone call. [Rule 11-901(A)] says, the proponent must produce evidence sufficient to support a finding that the items are what the proponent claims it is. . . . I'm making the finding that the preamble is sufficient to demonstrate that the call is what it purports to be, and that is a call in jail[.]

{20} Rule 11-901(A) provides that in order to "satisfy the requirement of authenticating or identifying an item of evidence, the proponent must produce evidence sufficient to support a finding that the item is what the proponent claims it is." On appeal, Defendant does not address the district court's ruling that the preamble to each recording provides sufficient foundation for admissibility. Instead, Defendant argues that the phone calls were inadmissible due to the State's failure to demonstrate (1) that "the proffered exhibits were the recordings prepared by" the State's witness or (2) "when the conversations contained in the recordings" occurred.

---

[2]This blank in the quoted material is specific to each user.

10

{21} Defendant's first argument is unclear to this Court but appears to be based on either the best evidence rule or the rule against hearsay. Defendant's briefing states that Villegas "was not even asked to identify the proffered exhibits as the same recordings he provided." Inasmuch as this argument implies that the State must produce the actual discs that Villegas prepared, we disagree. *See* Rule 11-1003 NMRA (providing for the admissibility of duplicate recordings). Inasmuch as Defendant's argument is based upon the rule against hearsay, and thus implies that Villegas was required to listen to the phone calls while preparing the recordings and then testify as to the content, we disagree. A records custodian is not required to have personal knowledge of the information contained in the records provided. *Cadle Co. v. Phillips*, 1995-NMCA-101, ¶ 6, 120 N.M. 748, 906 P.2d 739. Villegas was authorized by his superior to prepare recordings from the jail's phone system. He prepared recordings that contained certain phone conversations linked to Defendant's assigned PIN number. Each recording contains a preamble indicating that the call originated from the Santa Fe County jail. With respect to this portion of Defendant's argument, Villegas's testimony laid a sufficient foundation for admission.

{22} Defendant's second argument is that Villegas's testimony fails to indicate "when the conversations contained in the recordings" occurred. Although the recordings played for the jury were abridged, the content of the unabridged version

of each phone call references the events and/or individuals involved in the events at issue in this case, thereby clearly placing the date of each phone call during Defendant's pre-trial incarceration.[3] While the exact dates and times of phone calls could be required to satisfy a Rule 11-901 inquiry under certain circumstances, the content of the calls and the computer-generated preamble preceding each call renders the specific dates and times of Defendant's phone calls immaterial in this case.

{23}     The district court ruled that Exhibits 195A, 196, and 197A through 202A were recordings of Defendant's "call[s] in jail." In addition to Defendant's voice, the content of the recordings provided sufficient foundation "to support a finding that the item is what the proponent claims it is." Rule 11-901(A). As such, the district court's admission of the evidence did not constitute an abuse of discretion.

**Expert Witness Testimony**

---

[3]The recordings at issue were first admitted for authentication purposes as State's Exhibits 195 through 202. During trial, the State prepared abridged versions of Exhibits 195, 197, 198, 199, 200, 201, and 202 for publication to the jury. These recordings were admitted as Exhibits 195A, 197A, 198A, 199A, 200A, 201A, and 202A. Exhibit 196 was admitted in its entirety. Exhibit 195 contains discussion about Baker. Exhibit 196 contains discussion about Baker and Griego. Exhibit 197 contains discussion about State's witness Ronnie Montano. Exhibit 198 contains discussion about State's witness Cassandra Valencia. Exhibit 199 contains discussion about Baker and Griego. Exhibit 200 contains discussion about interactions at Griego's house. Exhibit 201 contains discussion about interactions at Griego's house. Exhibit 202 contains discussion about Baker and Griego.

12

{24} Defendant's final evidentiary arguments relate to (1) the district court's qualification of Agent Goret as an expert witness, (2) the reliability of Agent Goret's opinions, and (3) the reliability of computer-generated simulation exhibits utilized by Agent Goret in forming his opinions.

{25} "[T]he admission of expert testimony or other scientific evidence is peculiarly within the sound discretion of the trial court and will not be reversed absent a showing of abuse of that discretion." *State v. Alberico*, 1993-NMSC-047, ¶ 58, 116 N.M. 156, 861 P.2d 192. Because Defendant did not object at trial to the admission of computed-generated simulations utilized by Agent Goret, we review this part of Defendant's argument for plain error only. *See State v. Dylan J.*, 2009-NMCA-027, ¶ 15, 145 N.M. 719, 204 P.3d 44 (holding that this Court reviews unpreserved issues for plain error). Plain error occurs if "the testimony affected a substantial right of [the d]efendant." *Id.* However, we apply this doctrine "only if we have grave doubts about the validity of the verdict, due to an error that infects the fairness or integrity of the judicial proceeding." *Id.* (internal quotation marks and citation omitted).

{26} The admission of expert witness testimony is governed by Rule 11-702 NMRA, which has been interpreted by our Supreme Court to require that an expert witness (1) "be qualified[,]" (2) offer testimony that "will assist the trier of fact[,]" and (3) "testify only as to scientific, technical or other specialized knowledge." *Alberico*, 1993-

NMSC-047, ¶¶ 43-45 (internal quotation marks and citation omitted). We apply these requirements to Defendant's allegations of error.

**1.    Qualifications**

{27}    Defendant first argues that Agent Goret lacked sufficient expertise in the area of bullet trajectory analysis to be qualified as an expert witness. Defendant's argument is predicated on Agent Goret's limited experience (1) conducting bullet trajectory analysis and (2) testifying as an expert witness.

{28}    Agent Goret testified as to his qualifications as an expert in bullet trajectory analysis as follows:

[State Counsel:]    What training and/or experience do you have with regard to crime scene reconstruction?

[Agent Goret:]    With regards to crime scene reconstruction, I've attended a class on—specifically on crime scene reconstruction. I've attended two classes on bloodstain pattern analysis. I've attended a class on forensic shooting incident reconstruction[.]

. . . .

[State Counsel:]    What did the shooting incident reconstruction consist of as far as that training goes?

[Agent Goret:]    So that training consists with all of the facets of investigating an incident which involved any kind of shooting scene. It involves the identification of projectiles. It involves the proper processing of the crime scene with regards to determining the possible

14

trajectory of a projectile through objects or that have been deflected by objects.

Agent Goret additionally testified that he had performed bullet trajectory analysis as part of three crime scene reconstructions.

{29} Following this testimony and voir dire by defense counsel, the district court qualified Agent Goret as a crime scene investigator. Moments later, the district court modified its ruling, stating that Agent Goret was qualified as an "expert in crime scene reconstruction," including trajectory analysis, which is "a portion of crime scene reconstruction." Defendant argues in his reply brief that the district court's failure to expressly qualify Agent Goret as an expert in trajectory analysis resulted in an "abrogat[ion of] its gatekeeping function." In light of the district court's qualification of Agent Goret, discussed immediately above and in the footnote below, we consider Defendant's argument to be one of semantics.[4]

---

[4]The district court's statement to the jury was as follows: "I'm satisfied that [Agent Goret] . . . is an expert in crime scene reconstruction. The issue is whether he is going to be an expert in trajectory analysis itself, and that . . . is a portion of crime scene reconstruction. So I made him an expert in crime scene reconstruction. But as far as trajectory analysis, that would go to the weight and that will be your determination as to whether, because he's qualified as a crime scene reconstructionist, he's satisfied you on any analysis he makes with the trajectory analysis." Any expert witness must satisfy the jury with respect to the analysis and opinions offered. *See Alberico*, 1993-NMSC-047, ¶ 37 ("The jury is not required to accept expert opinions as conclusive[.]"). As such, the district court's statement did not result in an abrogation of its gatekeeping function, but instead was clearly intended to relay to the jury that Agent Goret is qualified in the area of trajectory analysis and that the jury

{30} While some expert witnesses have long years of experience or an extensive history of testifying at trial, such a background is not a prerequisite for being qualified as an expert in a given field. *See, e.g.*, *State v. Torrez*, 2009-NMSC-029, ¶ 18, 146 N.M. 331, 210 P.3d 228 (affirming the district court's qualification of an expert witness who "had not previously testified as an expert before a jury"). Instead, determinations as to whether a proffered expert is qualified turn solely on his or her "knowledge, skill, experience, training or education[.]" *Alberico*, 1993-NMSC-047, ¶ 43. "[U]se of the disjunctive 'or' in the rule indisputably recognizes that an expert witness may be qualified on the basis of any one of the five factors." *State v. Hernandez*, 1993-NMSC-007, ¶ 61, 115 N.M. 6, 846 P.2d 312 (internal quotation marks and citation omitted).

{31} Defendant's concerns about Agent Goret's qualifications are more properly addressed to the jury. *Cf. id.* ("Any perceived deficiency in [an expert witness's] education and training is relevant to the weight accorded by the jury to his testimony and not to the testimony's admissibility."). Agent Goret testified as to his training in the area of bullet trajectory analysis. Defendant offers no evidence that Agent Goret did not undergo such training. Because Agent Goret's training is sufficient to qualify him as an expert witness, such qualification did not constitute an abuse of discretion.

---

must determine whether it finds the testimony compelling.

## 2. Reliability

{32} Defendant next argues that Agent Goret's testimony was "unhelpful to the jury and substantially prejudicial." Defendant bases this claim on assertions that "[Agent] Goret's opinion was largely based on an unfounded assumption" and that "Agent Goret's 'scientific method' is . . . highly questionable." We address these arguments together.

{33} "[A]n expert witness may make assumptions based on evidence in the record to reach a conclusion that may be presented to a jury." *Zia Trust, Inc. v. Aragon*, 2011-NMCA-076, ¶ 19, 150 N.M. 354, 258 P.3d 1146. To be admissible, however, such conclusions must "assist the trier of fact." *Alberico*, 1993-NMSC-047, ¶ 44. To assist the trier of fact, expert testimony must be reliable and, therefore, relevant. *Zia Trust*, 2011-NMCA-076, ¶ 19. Relevant testimony "is sufficiently tied to the facts of the case that it will aid the jury in resolving a factual dispute." *State v. Downey*, 2008-NMSC-061, ¶ 30, 145 N.M. 232, 195 P.3d 1244 (internal quotation marks and citation omitted). As such, "for scientific evidence to be admissible under Rule 11-702, the reasoning or methodology underlying the testimony must not only be scientifically valid, it also must be properly . . . applied to the facts in issue." *Downey*, 2008-NMSC-061, ¶ 30 (omission in original) (alteration, emphasis, internal quotation marks, and citation omitted).

{34} Agent Goret testified that it was "likely" that one of Griego's gunshot wounds was inflicted while he was lying on the ground. Defendant characterizes this opinion as "an unfounded assumption." We disagree. Detectives recovered a bullet from the ground beneath Griego's body. Agent Goret testified that "the base of the bullet point[ed] back to the direction from which it appears to have come from" and to "match up" with a bullet hole in Griego's back. Agent Goret's opinion is consistent with the testimony of Detective Colombe, who stated that this bullet appeared to have been "stopped by the solid frozen ground." These observations "properly applied" Agent Goret's expertise "to the facts in issue" and support his opinion that the recovered bullet was fired into Griego's body while it lay on the ground. *Id.* (omission, emphasis, internal quotation marks, and citation omitted). That Agent Goret's opinion differs from Defendant's version of events does not make it unreliable. Instead, such a difference presents a question for the jury, not one of admissibility. *See State v. Sutphin*, 1988-NMSC-031, ¶ 21, 107 N.M. 126, 753 P.2d 1314 ("The fact finder may reject [the] defendant's version of the incident.").

{35} For similar reasons, Defendant's argument that Agent Goret's "scientific method" is unreliable is unconvincing. Defendant asserts that Agent Goret's hypotheses failed to account for movement by Defendant and Griego during the incident. At its core, however, Agent Goret's hypotheses are testing whether one of

18

Griego's gunshot wounds was inflicted while he was lying on the ground. As discussed immediately above, the physical evidence indicated this possibility. The State introduced Agent Goret's computer-generated simulations that demonstrated possible trajectories for the bullets that struck Griego. These simulations, when placed in context with the rest of the physical evidence, indicated to Agent Goret that it was "unlikely" that Greigo was standing for both shots. It is not the State's burden to present evidence of scenarios that are favorable to Defendant. Instead, it is Defendant's burden to cross-examine and present contrary evidence in the face of admissible expert testimony. *See Acosta v. Shell W. Expl. & Prod., Inc.*, 2016-NMSC-012, ¶ 28, 370 P.3d 761 ("Vigorous cross-examination, presentation of contrary evidence, and careful instruction on the burden of proof are the traditional and appropriate means of attacking shaky but admissible evidence." (internal quotation marks and citation omitted)).

{36}     Because the assumptions and hypotheses utilized by Agent Goret in forming his expert opinions were "properly applied to the facts in issue[,]" the opinions were reliable such that the district court's admission did not constitute an abuse of discretion. *Downey*, 2008-NMSC-061, ¶ 30 (omission, emphasis, internal quotation marks, and citation omitted).

**3.     Computer-Generated Simulation Exhibits**

19

**{37}** Defendant finally argues that an insufficient foundation supported the admission of computer-generated simulations utilized by Agent Goret in forming his opinions. Because Defendant failed to object to the admission of these exhibits at trial, we review for plain error only. *See Dylan J.*, 2009-NMCA-027, ¶ 15, (holding that this Court reviews unpreserved issues for plain error).

**{38}** This Court has previously upheld the admissibility of computer-generated evidence utilized by an expert witness in forming an opinion. *See generally State v. Tollardo*, 2003-NMCA-122, 134 N.M. 430, 77 P.3d 1023. In doing so, we held that "when an expert witness uses the computer to develop an opinion on the issue, the opinion is based in part on the computer-generated evidence" and "the proponent of the evidence must be prepared to show that the computer-generated evidence was generated in a way that is scientifically valid." *Id.* ¶ 14. Defendant failed to object to the admission of Agent Goret's computer-generated simulations. Given this failure, and the absence of evidence indicating that the exhibits are scientifically unreliable, Defendant is unable to demonstrate "an error that infects the fairness or integrity of the judicial proceeding." *Dylan J.*, 2009-NMCA-027, ¶ 15 (internal quotation marks and citation omitted). The district court's admission of the evidence did not constitute plain error.

**JURY INSTRUCTIONS**

**{39}** Defendant additionally argues that the district court erred in failing to give a jury instruction that specifically articulated a multiple-assailant self-defense theory. Because Defendant did not request such an instruction at trial, we review Defendant's claim for fundamental error. *See State v. Cunningham*, 2000-NMSC-009, ¶ 8, 128 N.M. 711, 998 P.2d 176 (holding that the defendant's failure to object to jury instructions as given results in review for fundamental error only). The doctrine of fundamental error is applicable "only under exceptional circumstances and only to prevent a miscarriage of justice." *State v. Barber*, 2004-NMSC-019, ¶ 8, 135 N.M. 621, 92 P.3d 633. "In reviewing the self-defense and defense of another jury instructions for fundamental error, [appellate courts] first determine whether a reasonable juror would have been confused or misdirected" by the instructions given. *State v. Sandoval*, 2011-NMSC-022, ¶ 20, 150 N.M. 224, 258 P.3d 1016 (internal quotation marks and citation omitted). To require reversal, an error must result in a conviction that is "so doubtful that it would shock the judicial conscience to allow the conviction to stand." *Cunningham*, 2000-NMSC-009, ¶ 13 (internal quotation marks and citation omitted).

**{40}** The jury instructions provided that a finding of self-defense or defense of another as to Defendant's shooting of either Baker or Griego required a verdict of not guilty. That the district court did not address the allegedly aggressive behavior of

21

Baker and Griego together, in a third jury instruction, would not "confuse[] or misdirect[]" a reasonable juror. *Barber*, 2004-NMSC-019, ¶ 19. Defendant presented his defense, which was based on claims of self-defense and defense of another, to the jury at trial. During closing arguments, delivered only moments after the district court instructed the jury, defense counsel summarized the case as follows: "No time to think, well, this guy's attacking me and my child brother. Should I shoot to the ground or shoot to the side? It's happening really fast. *Two large men are attacking them.* He's defending himself."

**{41}** In light of the instructions given, and Defendant's ability to "present[] his multiple assailant claim to the jury[,]" the fundamental error doctrine is not applicable. *Sandoval*, 2011-NMSC-022, ¶ 29.

**CONCLUSION**

**{42}** For the foregoing reasons, we affirm.

**{43}** **IT IS SO ORDERED.**

_____

**JAMES J. WECHSLER, Judge**

**WE CONCUR:**

22

_____

**LINDA M. VANZI, Chief Judge**

_____

**JONATHAN B. SUTIN, Judge**