IN THE COURT OF APPEALS OF THE STATE OF NEW MEXICO

Opinion Number: _____

Filing Date: <u>November 27, 2017</u>

**NO. A-1-CA-34747**

**STATE OF NEW MEXICO,**

Plaintiff-Appellee,

v.

**DENNIS SAMUEL MIERA,**

Defendant-Appellant.

**APPEAL FROM THE DISTRICT COURT OF BERNALILLO COUNTY**
**Benjamin Chavez, District Judge**

Hector H. Balderas, Attorney General
Maris Veidemanis, Assistant Attorney General
Santa Fe, NM

for Appellee

Assed & Associates
Richard J. Moran
Ahmad Assed
Albuquerque, NM

for Appellant

**OPINION**

**VARGAS, Judge.**

{1}     Defendant appeals his conviction for two counts of criminal sexual penetration of a minor (CSPM) (Child under 13), one count of criminal sexual contact of a minor (CSCM) (Child under 13), and one count of bribery of a witness, claiming that the district court erred when it allowed the State to impeach him with a psychological evaluation prepared as part of plea negotiations, that he was entitled to a new trial because the State suppressed evidence, that his counsel was ineffective, and alternatively, that all of these errors, taken together, denied him of his right to a fair trial. While we conclude that the admission of the psychological evaluation does not rise to the level of plain error, and the district court did not abuse its discretion by denying Defendant's motion for a new trial, the district court did err by allowing the State to impeach Defendant with the evaluation. This error, coupled with numerous errors by defense counsel, denied Defendant a fair trial. We reverse and remand for a new trial.

**I.     BACKGROUND**

{2}     Defendant Dennis Miera met Margarita Burciaga (Margarita) in 2000. The two began dating, and eventually moved in together. When the relationship ended in the spring of 2003, the couple split amicably, and Defendant continued to babysit

Margarita's children. In the summer of 2006, Defendant had agreed to watch G.M., Margarita's eight-year-old daughter. Before the visit took place, however, Margarita's six-year-old son and G.M. both told her that Defendant had sexually molested G.M. during previous visits. Margarita reported her discovery to the police, and G.M. was taken to a safehouse for an interview, where she gave details regarding the alleged sexual abuse. Defendant was arrested and indicted in April 2008. Defendant was initially represented by Joseph Riggs II (Attorney Riggs), who was replaced by Rafael Padilla (Attorney Padilla) in October 2013.

{3}     Prior to trial, Defendant attempted to negotiate a plea agreement with the State. In hopes of negotiating a more favorable plea, Defendant met several times with forensic and clinical psychologist, Dr. William Foote, and underwent an evaluation by Dr. Foote (the evaluation). The results of that evaluation were eventually turned over to the State in furtherance of plea negotiations. The negotiations proved unsuccessful, however, and Defendant's case went to trial in December 2014.

{4}     The jury found Defendant guilty on all counts charged in the indictment. Three months later in March 2015, Defendant filed a motion for new trial alleging a lack of disclosure of material evidence pursuant to *Brady v. Maryland*, 373 U.S. 83 (1963). The district court denied the motion and sentenced Defendant. Defendant appeals the judgment against him as well as the denial of his motion for new trial. Defendant's

2

appellate counsel submitted this appeal and filed a substitution of counsel later, in April 2015.

## II.    DISCUSSION

### A.    Plain Error

{5}    Defendant asserts that the district court committed plain error when it allowed the State the evaluation as impeachment evidence because the evaluation was created as part of plea negotiations. While we agree that the district court's ruling allowing the State to impeach Defendant with the evaluation was in error, we cannot conclude that the State's use of the evaluation, alone, raises grave doubts about the validity of the verdict.

### 1.    Use of Evaluation at Trial

{6}    The record is clear that the parties agreed at trial that the evaluation was created and given to the State as part of plea negotiations. The evaluation is "a psychological evaluation of [Defendant, created] to provide the court information regarding his sentencing relative to charges he is facing" and details Defendant's personal history, past occupations, and relationships.

{7}    The evaluation contains two damaging components to Defendant's defense. First, the evaluation contains a statement indicating that Defendant admitted that he continued to have overnight visits with G.M. and her brother through the date of the

offenses, a fact that Defendant claimed he did not remember during direct examination. Further, the evaluation contains a section entitled "Sex Offender Assessment," in which Dr. Foote appears to recount a series of admissions made by Defendant seeming to admit that he committed the alleged acts and excusing his conduct. Specifically, the evaluation states:

> [Defendant] used a number of different excuses to defend against the accusation he committed the sex offense. For example, he responded in the affirmative to responses such as "a little bit of sex play that happened between that person who accused me was because I'm not perfect" and he reported "the sex play that happened between me and the person who accused me was an accident." He also indicated that he believes that the allegations against him have been exaggerated and no one was hurt by what happened. Also, he indicated that this was an accident, that he slipped one time and made a mistake which he regrets.

{8} After the State rested its case but before Defendant testified, the State notified the district court that it intended to use the evaluation to impeach Defendant, conceding that because it was created to assist with sentencing, "it would be inappropriate" to introduce the evaluation during the State's case in chief. Citing *State v. Watkins*, 1979-NMCA-003, 92 N.M. 470, 590 P.2d 169, the State argued that the evaluation was appropriate impeachment evidence. Defense counsel had no immediate response to the State's argument, advising the district court that he had not seen the evaluation.

4

{9}    Noting the general inadmissibility of plea negotiations and the possibility of a doctor/patient privilege or waiver of the privilege related to the evaluation, the district court gave the parties a brief recess to gather "written authorities for use or nonuse of the material if [D]efendant contradicts those statements [in the evaluation.]" After the recess, defense counsel advised the Court that he had no authority to support the exclusion of the evaluation to impeach Defendant and stipulated to its use for that purpose, stating:

> [A]fter reviewing the [evaluation] and also the case that was provided, . . . *Watkins*, my initial reaction to the [c]ourt was since this was submitted to the State as part of plea negotiations, I would have argued that, you know, since it's part of plea negotiations, that that evidence would not be admissible in the evidence. But given the case, I can see where the State's arguing for its admissibility if it is going to impeach [Defendant] on the statements that are anticipated to be made, so we feel that it's probably going to be, you know, used for impeachment purposes. . . . [G]iven the case of . . . *Watkins*[, u]nless that case has been reversed, it seems to me that, you know, the statement could be used for impeachment.

The district court clarified, "so I understand that right now you don't have any authority to support opposition of the use of this information for impeachment purposes, and, therefore, you're submitting none; is that right?" Defense counsel answered in the affirmative, noting that he "had very little knowledge of this report, and [he] certainly didn't have a copy of it[.]" The district court ruled that the evaluation could be used to impeach the Defendant, and offered to "give a limiting

5

instruction, telling the jury that they can only use [the evaluation] for the purposes of credibility and impeachment." Defense counsel never indicated a desire for, nor requested such an instruction.

{10} Following the district court's ruling that the evaluation could be used to impeach Defendant, Defendant took the stand and testified on direct examination that he had no recollection of the children staying overnight at his home and reiterated that testimony on cross-examination, testifying that he did not recall telling Dr. Foote that the children stayed overnight with him. The State attempted to refresh Defendant's memory during cross-examination by allowing him to review the evaluation. Defense counsel did not object, and after reading the document to himself, Defendant stated, "I saw what I read, but to be honest with you, I don't remember stating that. I mean, it's written there, but that doesn't mean that I said it."

{11} Defendant testified on cross-examination that he had never admitted the allegations to anyone. Following Defendant's denial, the State questioned Defendant regarding specific responses Dr. Foote reported Defendant had made to a sex offender assessment completed as part of the evaluation. In doing so, the following exchange occurred:

> Q: In your meetings with Dr. Foote, did you answer in the affirmative . . . to the following statement: "A little bit of sex play that happened between that person who accused me was because I'm not perfect?"

A:    There was a lot more to that statement.

Q:    Respectfully, it's a yes or no question. Did you answer[?]

A:    Well, then, yes. That wasn't a question, that was an answer.

Q:    Did you answer in the affirmative to another—to the next following statement: "The sex play that happened between me and the person who accused me was an accident?"

A:    Yes.

Q:    Did you respond in the affirmative or otherwise indicate that you believed that the allegations against you have been exaggerated?

A:    Yes.

Q:    Did you respond in the affirmative or otherwise indicate that you believed that no one was hurt by what happened?

A:    Yes.

Q:    Did you respond in the affirmative or otherwise indicate that this was an accident?

A:    Yes.

Q:    Did you respond in the affirmative or otherwise indicate that you slipped one time?

A:    Yes.

Q:    Did you respond in the affirmative or otherwise indicate that you made a mistake which you regret?

A:    Yes.

{12} On redirect, Defendant described the format of the evaluation and explained that the statements quoted from the report represented answers that Defendant had chosen from a set of multiple-choice answers. Defendant testified that he completed the sex offender assessment twice, with each assessment taking about four hours to complete. The first time he took the test, Defendant explained, he did not answer the multiple choice questions the State had inquired about because he "felt they led to admitting guilt." Defendant testified that the second time he took the test, "[he] answered the questions the best that [he] could, because [Dr. Foote] said he couldn't do the evaluation . . . . He said he couldn't do the—finish the evaluation without those questions being answered." Defendant explained, "I was asked a question, and then you have a choice of A, B, C and D. And in my opinion, none of them were good, but he said . . . to be able to evaluate me, to evaluate where I was coming from and where I was at in my life, he said you have to answer one of those questions." While the State pressed Defendant to admit on re-cross-examination, that the test was actually in a "true/false" rather than multiple choice format, Defendant insisted that was not the case.

**2.      Standard**

{13} Defendant concedes that his counsel did not object to the State's use of the evaluation as impeachment evidence at trial. Appellate courts review unpreserved

8

evidentiary questions for plain error. *See* Rule 11-103(E) NMRA; *State v. Montoya*, 2015-NMSC-010, ¶ 46, 345 P.3d 1056. Plain error applies only where the substantial rights of the accused are affected, and exists where the admission of the testimony "constituted an injustice that created grave doubts concerning the validity of the verdict." *Montoya*, 2015-NMSC-010, ¶ 46 (internal quotation marks and citation omitted). It is intended to be used sparingly as an exception to the rule requiring objections, which promotes efficient and fair proceedings. *See State v. Paiz*, 1999-NMCA-104, ¶ 28, 127 N.M. 776, 987 P.2d 1163. "[I]n determining whether there has been plain error, we must examine the alleged errors in the context of the testimony as a whole." *Montoya*, 2015-NMSC-010, ¶ 46 (omission, internal quotation marks, and citation omitted).

{14} Rule 11-410(A)(5) NMRA prohibits "a statement made during plea discussions" from being admitted against the defendant where the discussions did not ultimately result in a guilty plea. According to our Supreme Court, the rule prohibits the admission of statements made during plea negotiations "as evidence at trial for either substantive or impeachment purposes." *State v. Trujillo*, 1980-NMSC-004, ¶ 19, 93 N.M. 724, 605 P.2d 232.

**3.      Use of Evaluation for Impeachment**

{15}      The State points to *Watkins* as support for its position that its impeachment of Defendant using the evaluation was proper. In *Watkins*, the prosecutor used portions of taped interviews to impeach the defendant during cross-examination after the defendant had introduced the tapes on direct examination in his own case in chief. 1979-NMCA-003, ¶¶ 15-17, 20. This Court concluded that, "[h]aving interjected the tapes into the trial for his own purposes, [the] defendant cannot properly complain of the prosecutor's use of the tapes, on cross-examination, to attack the credibility of [the] defendant's trial testimony." *Id.* ¶ 21. We explicitly limited our holding in *Watkins* to the circumstances of that case. *Id.* Using a previous version of Rule 11-410, which similarly barred the use of statements made in connection with pleas, the defendant asked us to determine whether the tape "was improperly used for impeachment because the statements used were part of plea bargain negotiations." *Id.* ¶ 18. We explicitly declined to address the issue, stating, "We do not decide whether, in the ordinary case, this rule prohibits use of such statements for impeachment purposes." *Id.* Instead, we reiterated the limited the scope of our decision, concluding that "[*u*]*nder the circumstances of th*[*at*] *case*, the rule did not bar the cross examination." *Id.* (emphasis added).

{16} The State suggests that, like the defendant in *Watkins*, Defendant's blanket statement of denial opened the door to the State's impeachment of that denial. *Watkins* carries minimal weight in our analysis of this issue; not only did *Watkins* specifically decline to address the issue presented in this case, it is factually distinguishable. Unlike *Watkins*, Defendant did not offer the evaluation into evidence in his case in chief, requiring that the prosecution respond. The statements set out in the evaluation and attributed to Defendant came in solely as impeachment evidence through cross-examination. We therefore decline the State's invitation to apply *Watkins* here.

{17} This case is more analogous to *Trujillo*. In *Trujillo*, the defendant identified, as part of plea negotiations, a police officer as the person to whom he had sold heroin. 1980-NMSC-004, ¶ 4. During his trial testimony, however, the defendant denied having made the sale entirely. The state used the identification made during plea negotiations to impeach the defendant, but did not proffer it as evidence in its case in chief. *Id.* ¶ 5. Our Supreme Court applied the precursor to Rule 11-410, which prohibited introduction of evidence drawn from plea negotiations. *See Trujillo*, 1980-NMSC-004, ¶ 6. The Court reasoned that the rule's purpose and importance in the justice system was to embody "the public interest in encouraging negotiations concerning pleas between the criminal defendant and the [s]tate." *Id.* ¶ 18. The Court

described guilty pleas as "an essential part of our criminal justice system," and explained that "candor in plea discussions aids greatly in the reaching of agreements between the defendant and the [s]tate." *Id.* ¶ 18. The Court reasoned that the parties "need to feel free to discuss the merits of the case, the alternatives for disposition, and the possible concessions each is willing to make." *Id.* ¶ 19. Concluding that Rule 11-410 "clos[es] the door on the admissibility of all these matters as evidence at trial for either substantive or impeachment purposes[,]" *id.*, the Court acknowledged the danger that some individuals may use the rule to testify inconsistently, but ultimately decided that "a weighing of conflicting policies demonstrates that the balance is tipped in favor of interpreting [the rule] as the cloak of privilege around plea negotiation discussions." *Id.* ¶ 21.

{18} In light of Rule 11-410's prohibition against using statements made during plea discussions and *Trujillo*'s application of the rule to statements used for impeachment purposes, the district court erred in allowing the evaluation to be used as impeachment evidence at trial. Nonetheless, while the wrongful admission of the evaluation causes us concern, the error in allowing the State to use the evaluation did not, in our view, rise to the level of plain error requiring reversal. Defendant had an opportunity to explain the answers contained in the evaluation and used to impeach his testimony. Furthermore, while the State read statements attributed to Defendant

12

from the evaluation, the evaluation itself was not introduced as an exhibit and was not provided to the jury. We are mindful that plain error is intended to be used sparingly, *see Paiz*, 1999-NMCA-104, ¶ 28, and cannot conclude that this error alone creates "grave doubts" about the validity of the verdict against Defendant. *Montoya*, 2015-NMSC-010, ¶ 46 (internal quotation marks and citation omitted).

**B.      Motion for a New Trial Based on Newly Discovered Evidence**

{19}      Defendant filed a motion for new trial after the guilty verdict was entered against him. In that motion, Defendant claimed that following the completion of his trial, his appellate counsel discovered the State had filed sexual abuse charges against Esteban Burciaga (Burciaga), Margarita's husband and G.M.'s stepfather, based on allegations G.M. made while Defendant's case was pending. G.M. later recanted those accusations, and the State entered a nolle prosequi dismissal of the case.[1] Defendant asserted that G.M.'s recantation constituted impeachment evidence under *Brady* and asked the district court to grant a new trial based on the State's failure to disclose the allegations against Burciaga and G.M.'s subsequent recantation. In light of the district court's conclusion that defense counsel was aware of the Burciaga case, we affirm the district court's denial of Defendant's motion for a new trial.

---

[1]The filed document contains the following language: "[T]he State of New Mexico . . . enters a [n]olle [p]rosequi in the above-captioned cause because the alleged victim recanted the statements made concerning allegations regarding this defendant."

13

**1.      Evidence of the State's Disclosure of the Burciaga Case Prior to Trial**

{20}      At the hearing on the motion, Defendant called his two previous attorneys as witnesses. Attorney Riggs, Defendant's first attorney, testified that, while the State had never turned over any information to him regarding Burciaga, Defendant had alerted him that Burciaga was suspected of molesting G.M. Attorney Riggs stated that he conducted a background check on Burciaga in 2009, but because that investigation predated Burciaga's indictment, he found nothing regarding sexual assault, molestation, abuse, or neglect. Attorney Riggs did not investigate the allegations against Burciaga any further.

{21}      Defendant's second attorney, Attorney Padilla, testified that he could not remember the State ever informing him of an incident, nolle prosequi, or recantation involving Burciaga, but did acknowledge that he had gotten some "[l]imited" information regarding Burciaga from Defendant, specifically that Burciaga may have gotten into trouble because of his behavior toward G.M. Attorney Padilla had no recollection of having questioned G.M. regarding lying or being molested by Burciaga, and he could not remember questioning Margarita about G.M.'s allegations against Burciaga. Furthermore, Attorney Padilla never investigated pending cases against Burciaga. Attorney Padilla testified, however, that he believed the existence of a similar case against Burciaga was critical to Defendant's case because the State

14

presented no physical evidence, Defendant's guilt was decided based on the credibility of the witnesses, and G.M. recanting similar allegations against a similarly situated individual was relevant to her credibility.

{22} In response to Attorney Riggs' and Attorney Padilla's testimony, the State called Jacob Payne, the prosecutor of both Defendant and Burciaga. Payne testified to a vague memory of a discussion of the nolle prosequi with Attorney Riggs, but could not provide any details regarding that conversation. Payne did, however, have a specific memory of discussing the nolle prosequi informally with Attorney Padilla in the courthouse, in the aisle of a courtroom gallery. During that conversation, Payne testified that Attorney Padilla asked whether Defendant's case would be dismissed as a result of G.M.'s recantation in the Burciaga case. Payne responded that it would not, asking about the feasibility of a plea agreement. Payne acknowledged that he had no written record of notifying defense counsel regarding the recantation. Payne stated that he had no recollection as to whether he discussed the existence of a tape recording of G.M.'s recantation with defense counsel but admitted that he never sent the tape to defense counsel. After viewing G.M.'s taped recantation, the district court summarized her statement as follows:

> [T]he alleged victim stated that . . . Burciaga's actions were an accident, that they occurred while talking, that he had been tickling her, and that he never touched her in the wrong way, essentially. Also that she said

that he had done otherwise because she was mad that he was mad at her about some sort of an incident involving nail polish and furniture[.]

{23} At the conclusion of the hearing, the district court found that Attorney Riggs acted with due diligence by conducting a background check on Burciaga in 2009 but was not aware of G.M.'s recantation while representing Defendant. The district court found Attorney Padilla's testimony to be truthful in that he had no recollection of discussing the nolle prosequi and recantation with Payne, but characterized Attorney Padilla's recollection as "attenuated and conditional[,]" noting that it was based not on actual memory but on the absence of actions he believed he would have taken if presented with that information. Payne's testimony, on the other hand, the district court found more persuasive, crediting the "detail, specificity, and exactitude of . . . Payne's memory[.]" Based on these findings, the district court concluded that "the defense was aware of the Burciaga case, the nolle [prosequi], and the recantation." The district court emphasized that it was "confined to review the case as an issue of newly-discovered evidence" and concluded that Defendant had not met four of the six factors necessary to receive a new trial under *State v. Fero*, 1988-NMSC-053, ¶ 12, 107 N.M. 369, 758 P.2d 783 (requiring a showing that the newly discovered evidence: (1) will probably change the result if a new trial is granted; (2) was discovered since the trial; (3) could not have been discovered before the trial by the exercise of due diligence; (4) is material; (5) is not merely cumulative; and (6) is not

16

merely impeaching or contradictory). As a result, the district court denied Defendant's motion for new trial.

**2. Defendant's Motion**

{24}    Despite characterizing his motion before the district court as a "*Brady* motion" and focusing his appellate arguments on an analysis under *Brady*, Defendant challenges the district court's denial of his motion for new trial. We review both issues—*Brady* claims and judgments on a motion for new trial—for an abuse of discretion. *See State v. Moreland*, 2008-NMSC-031, ¶ 9, 144 N.M. 192, 185 P.3d 363 ("We will not disturb a trial court's exercise of discretion in denying or granting a motion for a new trial unless there is a manifest abuse of discretion." (alteration, internal quotation marks, and citation omitted)); *Case v. Hatch*, 2008-NMSC-024, ¶ 47, 144 N.M. 20, 183 P.3d 905 (stating that *Brady* challenges are akin to an allegation of prosecutorial misconduct, which is reviewed for an abuse of discretion). "An abuse of discretion occurs when the ruling is clearly against the logic and effect of the facts and circumstances of the case. We cannot say the trial court abused its discretion by its ruling unless we can characterize it as clearly untenable or not justified by reason." *State v. Layne*, 2008-NMCA-103, ¶ 6, 144 N.M. 574, 189 P.3d 707 (internal quotation marks and citation omitted). In determining whether the district court abused its discretion, we defer to the district court's findings of fact if

substantial evidence exists to support those findings, but we review the application of the law to the facts de novo. *See State v. Hubble*, 2009-NMSC-014, ¶ 5, 146 N.M. 70, 206 P.3d 579.

{25}     The district court analyzes a *Brady* claim differently from a motion for new trial based on newly discovered evidence. *Compare Case*, 2008-NMSC-024, ¶ 44 (requiring a defendant seeking to overturn a conviction under *Brady* to prove three elements: the evidence was suppressed by the prosecution; the suppressed evidence was favorable to the defendant; and the suppressed evidence was material to the defense), *with Fero*, 1988-NMSC-053, ¶ 12 (setting out six requirements to succeed on a motion for new trial based on newly discovered evidence). Regardless of whether we analyze Defendant's argument through the lens of a *Brady* challenge or a motion for new trial, he fails to demonstrate an abuse of discretion.

**a.     Defendant's *Brady* Claim**

{26}     Defendant did not demonstrate to the district court that the State suppressed evidence, as required under *Brady*. The district court weighed Attorney Padilla's "attenuated, indistinct, and conditional recollective opinion[,]" against the "detail, specificity, and exactitude" of Payne's testimony to conclude that "the defense was aware of the Burciaga case, the nolle [prosequi], and the recantation." The district court's findings are supported not only by the testimony of Attorney Padilla and

Payne themselves, but also by the trial transcript, in which the State mentions the nolle prosequi of Burciaga in Attorney Padilla's presence. Prior to Defendant's commencement of his case in chief, the court questioned the parties, asking "was the stepfather ever investigated for child abuse against [G.M.] or sexual abuse of [G.M.] that anyone knows of?" The State responded, "he was, years later. . . . those charges were dropped; they were nolle'd by the [d]istrict [a]ttorney's [o]ffice. I believe it was in 2010. And, again, they were dropped." Attorney Padilla expressed no surprise and made no indication that he was previously unaware of this information. Payne's testimony and the State's representations regarding the investigation and subsequent nolle prosequi of Burciaga are sufficient to support the district court's factual findings that defense counsel was aware of the Burciaga case. *Brady* does not impose a disclosure obligation where, like here, a defendant already has access to the information or can access it by exercising due diligence. *See State v. Huber*, 2006-NMCA-087, ¶ 32, 140 N.M. 147, 140 P.3d 1096 (citing *State v. Altgilbers*, 1989-NMCA-106, ¶ 31, 109 N.M. 453, 786 P.2d 680 (acknowledging a lessened obligation to disclose where knowledge of recantation "was as available to the defense as it was to the prosecution")); *but see State v. Huerta-Castro*, 2017-NMCA-026, ¶ 36, 390 P.3d 185 (stating that disclosure during trial requires us to examine whether the late tender "impeded the effective use of evidence in such a way that impacts the

fundamental fairness of the proceedings"). This is not a case where the defendant did not have access to a witness or did not know the recantation existed. Here, the district court found that Defendant knew that G.M. had made accusations similar to those made in his case and knew the subject of those accusations. Defense counsel could have inquired into the status of the Burciaga case and easily learned of the recantation through the nolle prosequi document itself. Nonetheless, defense counsel neither requested further information, nor sought additional time to look into the matter. Because Defendant did not demonstrate that the State suppressed evidence throughout the trial, we conclude the district court did not abuse its discretion in denying Defendant's motion. *See State v. Rondeau*, 1976-NMSC-044, ¶ 40, 89 N.M. 408, 553 P.2d 688 (interpreting *Brady* "to mean that a convicted defendant would be entitled to a retrial where the prosecution suppressed, *throughout the whole trial*, exculpatory evidence material to the guilt or punishment of the defendant" (emphasis added)).

**b.      Motion for New Trial—Newly Discovered Evidence**

{27}     Defendant's argument that the district court abused its discretion under the standards set forth for a motion for new trial fails because Defendant has failed to demonstrate that defense counsel could not have discovered the recantation until after trial. To succeed on a motion for new trial based on newly discovered evidence, a

20

defendant must demonstrate, among other things, that the evidence was discovered after trial and that the evidence could not have been discovered before trial by the exercise of due diligence. *Fero*, 1988-NMSC-053, ¶ 12. According to the district court's findings, defense counsel had knowledge of the recantation before the trial ended, and as discussed above, the district court's findings are supported by the evidence and are entitled to deference.

{28}     Indeed, nothing in the record suggests the recantation "could not have been discovered before trial by the exercise of due diligence[.]" *Id.* Burciaga was indicted February 10, 2011, and the nolle prosequi was filed July 31, 2012. The nolle prosequi specifically states that "the alleged victim recanted the statements made concerning allegations regarding [Burciaga.]" Defendant's trial counsel, Attorney Padilla, who was retained by Defendant in 2013 after the Burciaga matter had been concluded, acknowledged that Defendant had informed him that G.M. may have made accusations against Burciaga, but admitted to not having done any investigation as to whether charges had been filed. Defendant was not tried until December 2014; Attorney Padilla therefore had ample time between the time he was retained and the trial in December 2014 to investigate the allegations against Burciaga. Doing so would have revealed the indictment, the nolle prosequi, and recantation. The district court's decision was therefore in accord with the facts of the case. The district court

21

did not abuse its discretion in concluding Defendant did not meet the requirements to prevail on his motion for new trial based on newly discovered evidence.

## C.    Ineffective Assistance of Counsel

{29}    Defendant argues that his trial counsel was ineffective by failing to adequately apprise himself of the applicable legal standards to effectively argue for the exclusion of the evaluation and by failing to investigate G.M.'s allegations against Burciaga. Our review of the record raised additional unexplained incidents that are a source of concern. Taken together, we believe Defendant has presented a prima facie case of ineffective assistance.

## 1.    Standard

{30}    The Sixth and Fourteenth Amendments of the United States Constitution guarantee criminal defendants the right to effective assistance of counsel. *Patterson v. LeMaster*, 2001-NMSC-013, ¶ 16, 130 N.M. 179, 21 P.3d 1032. To establish ineffective assistance of counsel, a defendant must show that: "(1) counsel's performance fell below that of a reasonably competent attorney; (2) no plausible, rational strategy or tactic explains counsel's conduct; and (3) counsel's apparent failings were prejudicial to the defense." *State v. Bahney*, 2012-NMCA-039, ¶ 48, 274 P.3d 134. Whether we address a claim of ineffective assistance through direct appeal depends on the completeness of the record. *See State v. Trujillo*, 2012-NMCA-

112, ¶ 48, 289 P.3d 238. Where the facts necessary to a full determination of ineffective assistance are not part of the record, but an appellant nonetheless makes a prima facie showing of ineffective assistance of counsel, an appellate court may remand for an evidentiary hearing. *See State v. Roybal*, 2002-NMSC-027, ¶ 25, 132 N.M. 657, 54 P.3d 61; *State v. Cordova*, 2014-NMCA-081, ¶ 7, 331 P.3d 980. Because the trial court's record "may not adequately document the sort of evidence essential to a determination of trial counsel's effectiveness[,]" ineffective assistance of counsel claims are often better adjudicated through habeas corpus proceedings. *State v. Grogan*, 2007-NMSC-039, ¶ 9, 142 N.M. 107, 163 P.3d 494 (internal quotation marks and citation omitted); *Duncan v. Kerby*, 1993-NMSC-011, ¶ 4, 115 N.M. 344, 851 P.2d 466 (acknowledging that habeas corpus proceedings are the "preferred avenue for adjudicating ineffective assistance of counsel claims"). "We review claims of ineffective assistance of counsel de novo." *State v. Dylan J.*, 2009-NMCA-027, ¶ 33, 145 N.M. 719, 204 P.3d 44.

**2.     Reasonably Competent Attorney Standard**

{31}     In determining whether counsel's performance fell below an objective standard of reasonableness, we "indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance[.]" *State v. Paredez*, 2004-NMSC-036, ¶ 14, 136 N.M. 533, 101 P.3d 799 (internal quotation marks and

23

citation omitted). In order to overcome the presumption that counsel acted reasonably, Defendant must show that the challenged action could not be considered "sound trial strategy." *State v. Hunter*, 2006-NMSC-043, ¶ 13, 140 N.M. 406, 143 P.3d 168 (internal quotation marks and citation omitted).

**a.      Duty to Apprise Oneself of Legal Standard**

{32}     It is beyond dispute that "no lawyer should approach any task without knowledge of the applicable statutes, court rules, and case law[.]" *Garcia v. State*, 2010-NMSC-023, ¶ 40, 148 N.M. 414, 237 P.3d 716 (alteration, internal quotation marks, and citation omitted); *State v. Lopez*, 1996-NMSC-036, ¶ 9 n.1, 122 N.M. 63, 920 P.2d 1017 (expressing dismay at the trial court's, prosecutor's, and defense counsel's failure to apprise themselves of the current state of the law three years after case law altered the legal standard, noting that "[a]ttorneys and judges have an obligation to keep abreast of current changes in the law"). In this instance, defense counsel apparently failed to apprise himself of the applicable legal authority governing the admissibility of the evaluation. It is clear from the record that Defendant intended to testify; and, in anticipation of Defendant's testimony, the State alerted the district court and defense counsel of its intent to use the evaluation for impeachment purposes. Notwithstanding the State's notice of its intent to impeach Defendant with the evaluation, Defendant's counsel apparently never took steps to

24

obtain a copy of the evaluation and did not even review it until moments before Defendant took the stand to testify. Though he knew the State considered the evaluation to be inadmissible in its case in chief, defense counsel apparently did no research into the question of whether information gathered through plea negotiations could be used as impeachment evidence. A cursory investigation into Rule 11-410 and its relevant case law leads to *Trujillo*, 1980-NMSC-004,[2] which is directly contradictory to the State's position. Even after the district court recessed specifically to allow him an opportunity to address the State's argument and case law, defense counsel presented no argument to distinguish Defendant's case from *Watkins*, 1979-NMCA-003, and apparently did not seek to ascertain whether *Watkins* had been overruled or limited by subsequent case law. Instead, it appears from the record that defense counsel simply accepted the State's representation that no contrary authority existed.

{33} We next look to whether a "plausible, rational strategy or tactic explains [defense] counsel's conduct[.]" *Bahney*, 2012-NMCA-039, ¶ 48. The statements from the evaluation used by the State to impeach Defendant were tantamount to his repeated admission of guilt. Indeed, the State pointed this out during its argument to

---

[2]We note that annotations of Rule 11-410 reveal clear, unequivocal statements that information gathered during plea negotiations may not be used as impeachment evidence.

25

the district court. Acknowledging the detrimental nature of the evaluation, the district court offered defense counsel an opportunity to limit the jury's consideration of those statements to impeachment and credibility. Defense counsel did not, however, avail himself of this opportunity or seek to limit the use of the evaluation in any way. We see no reasonable professional calculation that could support Attorney Padilla's failure to conduct any pre-trial investigation into the existence and content of the evaluation. Furthermore, it is inconceivable that defense counsel's total failure to apprise himself of the law governing the use of information gathered during plea negotiations for impeachment might be considered sound trial strategy. *See Garcia*, 2010-NMSC-023, ¶ 40 (concluding counsel did no research to discover an amendment to statute, stating, "[w]e cannot conceive of a strategic reason for [defense counsel's actions]. . . . It is of little comfort that both the prosecution and the trial court appear to have labored under a similar misapprehension of the law").

**b.     Failure to Investigate Burciaga Case**

{34}     In addition to apprising himself of the relevant law, counsel has a duty to investigate. *See State v. Barnett*, 1998-NMCA-105, ¶ 30, 125 N.M. 739, 965 P.2d 323 ("Failure to make adequate pretrial investigation and preparation may . . . be grounds for finding ineffective assistance of counsel." (internal quotation marks and citation omitted)). Courts may find counsel's performance deficient where he "fail[s] to

26

investigate a significant issue raised by the client." *State v. Hunter*, 2006-NMSC-043, ¶ 14. However, a "general claim of failure to investigate is not sufficient to establish a prima facie case if there is no evidence in the record indicating what information would have been discovered." *Cordova*, 2014-NMCA-081, ¶ 10.

{35} In this case, defense counsel admitted he had received information from his client that Burciaga had gotten in some trouble because of his behavior toward G.M. but failed to investigate that information. Undoubtedly, allegations of sexual molestation of the victim by another individual around the same time period raise questions about the identity of the actual perpetrator of the molestation. We cannot conceive of a plausible rational strategy or tactic that would explain defense counsel's failure to investigate another possible abuser of G.M.

{36} Defense counsel also made it clear that if he had known of G.M.'s recantation, he would have used it to impeach her credibility during his cross-examination. Indeed, defense counsel stressed the importance of the recantation, stating that it "would have changed the course of the trial." Considering the importance that defense counsel himself assigned to G.M.'s recantation, it is difficult to imagine that defense counsel's failure to discover that information was the result of a tactical decision. Indeed, in a trial involving allegations of sexual abuse, there can be little more probative evidence than that which suggests the possibility that the allegations

27

made by the alleged victim are false; and, evidence of the falsity of prior similar allegations are significant indicia of innocence that any effective attorney knows to pursue.

**c.      Additional Competence Issues**

{37}      The record also reveals unexplained instances in which defense counsel's actions may warrant additional evidentiary inquiry. For example, on cross-examination, defense counsel asked one of the investigating officers what information he had gathered that had led him to arrest Defendant. The officer responded that, "based on his sexual desires, it all fits in with the sexual deviant nature of the individual." To that point, there had been no testimony about Defendant's sexual desires or sexually deviant nature. The officer's response was given without explanation, support or context. Rather than defense counsel moving to strike the officer's statement, it was the State who objected to its own witness's testimony arguing that it was "going to essentially irrelevant consensual sex acts between two adults that don't really bear on this particular issue at all" and that continuing with the line of questioning was likely to result in reversible error. Though the State's objection was sustained, the characterization of Defendant as a sexual deviant went unexplained, and was never limited or stricken from the record. While this line of questioning appears to have been a tactic of defense counsel, one must question the

wisdom of pursuing a line of questioning so objectionable that the State intervenes in an attempt to save its case from reversal on appeal.

{38} Defense counsel also sought to admit a Children, Youth, and Families Department (CYFD) report about an incident involving G.M. that was reported around the time of Defendant's arrest. It appears defense counsel did not, however, investigate the circumstances surrounding the report, research its admissibility, or even thoroughly review it before proffering it to the district court. The report resulted from an altogether separate claim made by G.M. that her mother and Burciaga had physically abused her. Defense counsel initially argued to the district court that the report should be admitted to attack G.M.'s credibility because "the report by the alleged victim in this case was found unsubstantiated when she was complaining of, you know, physical abuse by her stepfather and mother." After inquiring as to whether the complaint included allegations of sexual abuse, to which defense counsel responded, "[n]o," the district court denied Defendant's request to admit the CYFD report for the requested purpose.

{39} Following a break, defense counsel later renewed his request to introduce the CYFD report, stating, "But I was looking at the report, and I know the [c]ourt indicated it was not relevant, but I was reading a part of the report, especially one part of it." According to the record, the report stated that during the CYFD investigation,

29

G.M. had been questioned about "good touch and bad touch[,]" that she "was able to give at least two examples of each[,]" and that "she denie[d] that she has ever had a bad touch with anyone." Despite the district court twice asking for authority to support the report's admission, defense counsel offered none. Nothing in the record indicates defense counsel interviewed the caseworker who wrote the report or made arrangements to call any appropriate witnesses to introduce the report or testify about G.M.'s admission that she had never experienced "bad touch." In fact, it appeared that the break in the trial was the first time he had read the portion of the report related to CYFD's investigation into whether G.M. had been touched inappropriately. In a case in which the credibility of one particular witness is of paramount importance, G.M.'s admission to CYFD that she had never experienced "bad touch" was certainly an important piece of evidence that should not, as it appears, have been first considered in the midst of trial.

{40} This is not a case where a defendant makes a vague assertion that his attorney failed to investigate some undisclosed yet pivotal issue. Defendant placed evidence in the record that defense counsel failed to pursue a specific lead given to him by his client that either suggested Burciaga as an alternate perpetrator or called into question G.M.'s credibility. The record further reveals a report in defense counsel's possession prior to trial containing an important admission by the victim that she had not, in fact,

30

been touched inappropriately. Defendant points, with particularity, to the evidence that would have been discovered as a result of thorough investigation of the claims against Burciaga and specifies that the evidence was probative of a key witness's credibility. These matters, along with defense counsel's lack of preparation regarding other substantive and legal issues cannot be construed as plausible or rational strategy. We are satisfied that Defendant has made a prima facie case that defense counsel's performance fell below that of a reasonably competent attorney. *See Bahney*, 2012-NMCA-039, ¶ 48.

### 3. Prejudice

{41}    In addition to showing that defense counsel's performance fell below that of a reasonably competent attorney, Defendant must show that "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Cordova*, 2014-NMCA-081, ¶ 9 (internal quotation marks and citations omitted). In deciding whether Defendant was prejudiced by defense counsel's failures, "we must compare the weight of [the] prejudice against the totality and strength of the evidence of [a d]efendant's guilt and determine if the outcome of the trial has been rendered unreliable." *Roybal*, 2002-NMSC-027, ¶ 26.

{42} Often in ineffective assistance cases, the defendant is not prejudiced by defense counsel's ineffectiveness because the totality and strength of the evidence of the defendant's guilt restores our confidence in the outcome of the trial. *See, e.g.*, *id.* ¶ 28. The State asserts that is the case here. We are not convinced, as the evidence is not so overwhelming or persuasive that it reassures us Defendant received a fair trial.

{43} This case involved competing credibility determinations. No physical evidence was ever presented. Aside from Defendant and G.M., both of whose testimony was tainted by the irregularities discussed above, five people testified—G.M.'s brother, Margarita, two investigating officers, and the safehouse interviewer. Each witness reiterated the allegations of abuse described to them by G.M., or explained the series of events immediately after G.M. made the allegations against Defendant. G.M.'s brother was the only witness to testify to events that were not based entirely on G.M.'s memory and recitations. Although he testified he had walked in on Defendant and G.M. shirtless and under the covers, G.M.'s brother admitted that he had never "seen them together doing it[.]" Furthermore, prior to testifying at trial, G.M.'s brother had never told anyone that he had seen G.M. and Defendant under the covers in the almost seven years between the time of Defendant's arrest and the trial.

{44} This court is reluctant to decide ineffective assistance of counsel claims without first having before us all of the required facts to make an informed decision.

*See State v. Swavola,* 1992-NMCA-089 ¶ 3, 114 N.M. 472, 840 P.2d 1238 ("Recent decisions by this [C]ourt have expressed our reservations about deciding claims of ineffective assistance of counsel in the absence of a district court evidentiary hearing on the matter."). "We read our Supreme Court jurisprudence as acknowledging this Court's discretion to remand a case for an evidentiary hearing where a defendant has made a prima facie case of ineffective assistance." *Dylan J.*, 2009-NMCA-027, ¶ 42. The number, as well as the nature of the errors and irregularities discussed above appear to have had a considerable impact on this case, as they dealt mostly with the credibility of G.M. and Defendant, upon which this case turns. *See State v. Ortiz-Burciaga*, 1999-NMCA-146, ¶ 9, 128 N.M. 382, 993 P.2d 96 (acknowledging that child abuse cases "turn[] on the jury's determination of the credibility of the defendant and the young victim"). The evidence of Defendant's guilt in this instance is not so overwhelming as to alleviate our concerns regarding the prejudicial effect of defense counsel's deficiencies. We therefore conclude Defendant has demonstrated a prima facie case of ineffective assistance of counsel. Because we find cumulative error, as discussed below, however, it is unnecessary to remand this case for an evidentiary hearing on ineffective assistance of counsel at this time.

## D. Cumulative Error

{45} "Cumulative error requires reversal of a defendant's conviction when the cumulative impact of errors which occurred at trial was so prejudicial that the defendant was deprived of a fair trial." *State v. Martin*, 1984-NMSC-077, ¶ 17, 101 N.M. 595, 686 P.2d 937 ("We must reverse any conviction obtained in a proceeding in which the cumulative impact of irregularities is so prejudicial to a defendant that he is deprived of his fundamental right to a fair trial."). The doctrine is strictly applied, however, and "cannot be invoked when the record as a whole demonstrates that the defendant received a fair trial." *State v. Salas*, 2010-NMSC-028, ¶ 39, 148 N.M. 313, 236 P.3d 32 (internal quotation marks and citation omitted).

{46} Although the admission of the evaluation alone does not rise to the level of plain error, we do note that it contained information that was tantamount to an admission of guilt by Defendant. The prejudice of an erroneously admitted apparent admission of guilt by a criminal defendant is obvious, regardless of whether Defendant is given the opportunity to explain his answer. This error, coupled with the numerous errors by Defendant's counsel, including his failure to investigate the sexual molestation charges against G.M.'s stepfather, Burciaga, his failure to discover G.M.'s recantation of her allegations against Burciaga, his failure to move to strike or otherwise remedy the characterization of his client as a sexual deviant, and his

failure to review and take steps to properly introduce the CYFD report containing G.M.'s admission that she has never experienced "bad touch" are so numerous and egregious that we are persuaded that Defendant was denied his right to a fair trial. *See, e.g.*, *State v. Wilson,* 1990-NMSC-019, ¶¶ 25, 31, 109 N.M. 541, 787 P.2d 821 (concluding that cumulative error denied defendant fair trial when prosecutor engaged in misconduct, and the trial judge communicated with a juror during trial about an issue in the case without the defendant's participation); *see also Martin*, 1984-NMSC-077, ¶¶ 17-18, 22, 25-26, 30 (concluding that unchallenged inappropriate comments and gestures from the trial judge, along with the defendant's improperly admitted criminal history and the court's refusal to admit films to corroborate the defendant's claim of victim's tendencies toward violent sexual conduct constituted cumulative error requiring a new trial). Although none of the errors discussed above constitute grounds for reversal standing alone, together they deprived Defendant of a fair trial. We therefore reverse.

**E.      Sufficiency of the Evidence**

{47}     Having determined that the cumulative error in this case warrants reversal, we next determine whether the State presented sufficient evidence to support Defendant's conviction. *See State v. Post*, 1989-NMCA-090, ¶ 22, 109 N.M. 177, 783 P.2d 487 (requiring consideration of sufficiency of the evidence to prevent courts from running

35

afoul of double jeopardy principles when remanding for retrial). When considering whether sufficient evidence exists to support retrial, we consider all evidence—even that which was wrongfully admitted. *See id.* In reviewing for sufficiency, "we view the evidence in the light most favorable to the verdict and draw all inferences in favor of the verdict to determine whether substantial evidence of either a direct or circumstantial nature exists to support a verdict of guilty" as to each element of the offense. *State v. Suazo*, 2017-NMSC-011, ¶ 32, 390 P.3d 674 (internal quotation marks and citation omitted).

{48}    Defendant was convicted of CSPM, CSCM, and bribery of a witness. CSPM is defined as unlawful and intentional "causing of a person to engage in sexual intercourse, cunnilingus, fellatio or anal intercourse or the causing of penetration, to any extent and with any object, of the genital or anal openings of another[.]" NMSA 1978, § 30-9-11(A) (2009). When perpetrated on a minor under the age of thirteen, CSP is a first degree felony. NMSA 1978, § 30-9-11(D)(1). CSCM is an unlawful and intentional "touching or applying force to the intimate parts of a minor" or the "causing of a minor to touch one's intimate parts" including "the primary genital area, groin, buttocks, anus or breast." NMSA 1978, § 30-9-13(A) (2003). Bribery of a witness consists of knowingly "intimidating or threatening any person or giving or offering to give anything of value to any person with the intent to keep the person

36

from truthfully reporting . . . information relating to the commission . . . of a felony[.]" NMSA 1978, § 30-24-3(A)(3) (1997).

{49} During trial, G.M. labeled two drawings as Defendant and herself, marked where the penis and vagina were on the corresponding images, and testified that Defendant's penis touched her vagina, and G.M. testified that Defendant had put his penis in her mouth. G.M. also testified that Defendant would sometimes shower with G.M. and G.M.'s brother and that during those showers, she would touch Defendant's penis. G.M. testified that during one of those episodes, Defendant told her "not to tell no one or else he would go to jail." In light of this testimony, and indulging any inferences in favor of the verdict, we conclude that the evidence was sufficient to support a guilty verdict as to each charge.

**III.    CONCLUSION**

{50} We reverse Defendant's conviction, and remand for retrial. Because we remand for retrial, it is unnecessary at this time to order an evidentiary hearing on Defendant's ineffective assistance of counsel claim.

{51}    **IT IS SO ORDERED.**

_____

**JULIE J. VARGAS, Judge**

37

**WE CONCUR:**

_____
**JONATHAN B. SUTIN, Judge**

_____
**J. MILES HANISEE, Judge**